PER CURIAM.
hWe granted the state’s application to review the decision of the district court providing respondent with post-conviction relief from his conviction and sentence for aggravated rape in violation of La.R.S. 14:42. For the reasons that follow, the judgment below is vacated and respondent’s conviction and sentence are reinstated.
The state charged respondent with aggravated rape on the basis of allegations made by C.C., the granddaughter of Gayle Ardoin, respondent’s live-in partner, that respondent had repeatedly abused her sexually over the course of the several years she lived in the home with the permission of her legal guardian, Paula Martinez, Gayle Ardoiris sister. C.C.’s fortuitous revelations of respondent’s conduct during *405 a visit to her father in 2006 led to her removal from the Ardoin household when she was 12 years old. After living with her father and his wife, C.C.’s stepmother, for approximately two months, and then moving back in with Martinez for a month, C.C. moved next door to the residence occupied by Martinez’s daughter and Ar-doin’s niece, Chantell Percle, whom C.C. referred to as her “nanny,” and her husband, Michael Percle. C.C. was still living with the Percies at the time of respondent’s trial in June 2008.
|2To bolster C.C.’s testimony at trial detailing the respondent’s intense sexual abuse of her over the years, the state called three other witnesses to underscore for jurors respondent’s lustful disposition toward, and highly inappropriate behavior with, young females, although nothing he did with them approached his conduct with C.C. The state also elicited testimony from Detective Cher Pitre, lead investigator in the case, that C.C.’s revelations described a classic “grooming” scenario in which child sex abusers ingratiate themselves with their victims by giving them gifts, becoming their friends, and soothing them when another adult disciplines them as a gateway to escalating their sexual advances from mere touching to sexual intercourse. Pitre had known C.C. since the age of three, when the detective interviewed her in the course of investigating allegations that C.C.’s father had been sexually abusing young girls. Pitre acknowledged that C.C. gave a statement to the effect that her father had put his penis in her “coonie.” The detective discounted the statement as obviously coached and the subsequent conviction of C.C.’s father and his registration as a sex offender did not involve any conduct with his daughter.
In his own testimony, respondent flatly denied sexually abusing C.C. and attributed her allegations of abuse to resentment over the fact that as she grew older and became increasingly ungovernable, beyond the capacity of Ardoin to manage, as evidenced by C.C.’s chronic truancy from school, he stepped in and became the disciplinarian in the Ardoin household. Respondent testified that on the day C.C. went to the police with her allegations against him, he had consulted an assistant district attorney in the Office of Youth Development about her behavior and what steps were available to him to bring her under control. Ardoin also attested to C.C.’s increasingly volatile behavior and suggested that something else altogether may have been going on with her granddaughter. Ardoin recalled |sthat on one occasion when she visited the Percle residence and called out for her granddaughter, C.C. and Michael Percle stumbled out of a bedroom. C.C. was adjusting her underwear and skirt and Percle was looking nervous. When Ardoin asked what was going on, they replied, “We was playing.” As the prosecutor, assistant district attorney Mark Rhodes, acknowledged, by way of making the point on cross-examination that Ardoin did nothing about the incident and did not report it because she was a less than attentive guardian of C.C., “What you saw by any reasonable standard sounds like a young girl who’s being sexually involved with an adult man....”
In her own testimony, however, C.C. recalled for jurors that when she was 12 years old, respondent had sent her for a medical examination to determine whether she had become sexually active. The nurse practitioner who conducted a general medical examination took C.C. at her word that she was not sexually active and did not attempt more detailed physical findings. C.C.’s testimony prompted the prosecutor to ask whether she had in fact been “sexually active other than the things that Norman had done to you,” to which C.C. replied, “No.”
*406 The jury trial conducted in June 2008 ended in a verdict of guilty as charged. Jurors thereby rejected defense counsel’s argument that respondent had, in effect, become an unwitting pawn in an intra-family custody dispute in which C.C. used allegations of sexual abuse to facilitate her perceived interests in where and how she wanted to live, making use of her skills at dissembling and manipulating she first displayed at the age of three when she falsely accused her own father of rape. The court sentenced respondent on July 18, 2008 to the mandatory term of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The court of appeal affirmed respondent’s conviction and sentence, State v. Pierre, 09-0454 (La.App. 1 Cir. 9/11/09), 17 So.3d 519 (unpub’d), and this Court denied review. State v. Pierre, 09-2267 (La.4/16/10), 31 So.3d 1054.
During pendency of respondent’s appeal, two events occurred that shaped the post-conviction proceedings initiated after this Court denied writs on direct review. In February 2009, C.C. reported to the police that she and a girlfriend had been riding around with a teenage boy, B.B., they had just met and that he had forced both of them to perform sexual acts. An arrest warrant issued for B.B., but only days after she made the complaint, C.C. met with prosecutor Rhodes, who had developed a relationship with her over the course of preparing her testimony for respondent’s trial, and.admitted the report was false and that the sex with B.B. was consensual. The warrant for B.B. was never executed. At the end of October 2009, C.C. then revealed, as Gayle Ardoin’s testimony had suggested, that, in fact, Michael Percle had also been sexually abusing her during the same period of time respondent was molesting her. Detective James Daigle investigated the complaint and on November 5, 2009, C.C. was interviewed at the Terrebonne Parish Children’s Advocacy Center, where she had also been interviewed after revealing respondent’s abuse of her. The investigation did not result in the arrest or prosecution of Michael Percle and Detective Daigle closed his file at the end of the year.
C.C.’s allegations against Michael Percle resurfaced, however, in Claim Three of an application for post-conviction relief filed by respondent in 2011. The application quoted directly from a letter prosecutor Rhodes had written to respondent’s appellate counsel on March 23, 2011. The letter advised counsel that while C.C. had denied at trial sexual activity with anyone other than respondent, she had subsequently made allegations against a third party (Percle), “stating that the two molestations ... overlapped.” The letter further advised counsel that he | shad agreed with the detective handling the case they did not have “near enough to make an arrest” because the victim “is a very troubled young girl and comes from a dysfunctional family,” who had been placed in therapy “to determine whether she would recant the story about the third party molestation.” Rhodes also acknowledged, however, that to date, “she had continued to state that she was molested by this third party.” The upshot of these revelations in the March 2011 letter, post-conviction counsel asserted in his Claim Three, was that “[t]his fact, which could not have been introduced at trial, coupled with the fact that C.C.’s father is a convicted child molester and that C.C. contends that two men very close to her, both of whom have served as father figures in her life, both molested her during the same time period, is highly probative and damaging to C.C.’s credibility and would have very likely caused the jury to render a different verdict.”
*407 At the post-conviction hearings conducted on August 8 and August 9, 2012, various witnesses testified, including C.C., Rhodes, and Detective Daigle. Rhodes and Daigle recalled putting their heads together and deciding that the detective needed something more before pursuing C.C.’s claims against Percle. Daigle testified that at the time, he “was not familiar at all with Mr. Pierre’s case” because he had not been involved in respondent’s prosecution. The detective thus did not appreciate the implications of C.C.’s claims against Percle for respondent’s own case, and other than the investigation he conducted through November and December 2009, he did nothing further in the case. “Quite frankly,” Daigle testified, “I perceived some credibility issues.” Rhodes, on the other hand, had prepared C.C.’s testimony for trial and he testified that at the time, she “was always pretty clear that it was a one-perpetrator situation.” Although he deemed the B.B. incident “fairly insignificant,” Rhodes fully understood the implications of C.C.’s allegations against Michael Percle for respondent’s case and thus felt duty | fibound to reveal them to appellate counsel “as soon as I could.” C.C. testified that she did not reveal the abuse at the hands of Percle either before or during respondent’s trial, because she was afraid that if she did so, she would be removed from the home and deprived of her “nanny,” as in fact happened after her interview at the Children’s Advocacy Center. C.C. testified that she decided to come forward when her nieces, ages three and six, began visiting the Percle home and she became afraid that what had happened to her would happen to them. As for the incident involving B.B., C.C.’s girlfriend had made the first complaint and C.C. testified she lied to cover her friend and initially to protect herself.
By the end of the hearings, respondent’s Claim Three had become embroiled in the standard proposed by this Court in State v. Conway, 01-2808 (La.4/12/02), 816 So.2d 290, for free-standing, post-conviction claims of actual innocence not based on DNA evidence. Although this Court declined to hold that such claims are, in fact, cognizable in collateral attacks on final convictions, a question also left open in federal habeas proceedings by the United States Supreme Court in Herrera v. Collins, 506 U.S. 390, 417, 113 S.Ct. 853, 869, 122 L.Ed.2d 203 (1993), we observed that such claims must necessarily involve “new, material, noncumulative and conclusive evidence which meets an extraordinarily high standard, and which undermine[s] the prosecution’s entire case.” Conway, 01-2808 at 1, 816 So.2d at 291 (internal quotation marks and citations omitted). For the state, the Percle allegations- went only to C.C.’s credibility and not to actual innocence. Respondent’s counsel acknowledged that “the case of Conway does talk about a claim of actual innocence,” and conceded that “we are certainly not providing a hundred percent proof of actual innocence .... it cannot be done without DNA.... [or] putting this man in another country ... for years- when these allegations occurred.”. Counsel emphasized, however, that respondent was “not arguing that |7MichaeI Percle molested her, and [B.B.] molested her, and-she’s confused about who was molesting her.” Instead, counsel argued that C.C. “makes delayed allegations, that she makes false allegations and this calls her truthfulness into question, and it is her truthfulness and her statements which are the crux of the trial and the conviction of Mr. Pierre.” Counsel thus deemed that “[w]e have hit the Conway standard” by providing “new, material ... non-cumulative, conclusive evidence,” not amounting to “actual proof of actual innocence, but ... enough to put in front of a jury for a new trial, which would *408 be a fair trial for Mr. Pierre based on this newly discovered evidence.”
The argument persuaded the district court that respondent had in fact made a successful claim under the Conway standard. Pretermitting respondent’s other claims, the court granted post-conviction relief on Claim Three because “[t]he evidence adduced at the [post-conviction] hearing, including but not limited to the child victim’s post-trial recanting of her prior denials under oath of having been abused by others, one of whom she now accuses of abusing her during the same time periods involved in his case and the other of whom she falsely accused, at the very least undermines the prosecution’s entire case and deprived the defendant of being able to use the information to cross-examine her at the trial.” The First Circuit denied review summarily. State v. Pierre, 13-0150 (La.App. 1 Cir. 4/5/13) (Crain, J., dissenting with reasons).
In his brief to this Court, post-conviction counsel concedes that, in fact, respondent did not meet the Conway standard and that the district court “improvidently found that Respondent made a bona fide claim of actual innocence.” Counsel nevertheless argues that the court reached the correct result for an entirely different reason. It was clear from Detective Daigle’s testimony at the post-conviction hearing that investigation of the Michael Percle allegations 18came to an end at the close of 2009 and that his conversation with Rhodes must therefore have occurred during that time. Counsel argues that Rhodes in effect sat on the information for well over a year and that when he finally disclosed it to appellate counsel, not to trial counsel or to respondent himself, on March 23, 2011, the time for filing a motion for a new trial on grounds of newly discovered evidence had grown so short that respondent was effectively denied the opportunity to move for a new trial based on newly discovered evidence pursuant to La.C.Cr.P. art. 851(3). Counsel takes as his premise that the one-year period for filing motions for a new trial on grounds of newly discovered evidence provided by La. C.Cr.P. art. 853 began to run from the date of finality of his conviction and sentence, April 16, 2010, when this Court denied review of the First Circuit’s decision. Counsel argues that the delayed disclosure deprived respondent of due process and alone justified the trial court’s grant of post-conviction relief.
Counsel did not make this argument in the district court but as the proponent of the court’s judgment granting respondent post-conviction relief and a new trial, he is entitled to assert any ground fairly supported by the record as a basis for upholding that judgment. State v. Butler, 12-2359, pp. 4-5 (La.5/17/13), 117 So.3d 87, 89. The district court nevertheless erred in its ruling for two reasons. First, as respondent now readily concedes, the present case is not the one for this Court to decide definitively that free-standing claims of actual innocence not based on DNA evidence are cognizable in state post-conviction proceedings. Cf. House v. Bell, 547 U.S. 518, 554-55, 126 S.Ct. 2064, 2086-87, 165 L.Ed.2d 1 (2006) (“House urges the Court to answer the question left open in Herrera and hold not only that freestanding innocence claims are possible but also that he has established one. We decline to resolve the issue. We conclude here, much as in Herrera, that whatever burden in a hypothetical freestanding innocence claim |flwould require, this petitioner has not satisfied it.”). Because this Court has never actually implemented the Conway standard, we have not clarified whether it requires a petitioner not simply to undermine the state’s entire case but also to *409 prove that he or she is probably factually innocent. See, e.g., Carriger v. Stewart, 132 F.3d 463, 476-77 (9th Cir.1997) (“Requiring affirmative proof of innocence is appropriate, because when a petitioner makes a freestanding claim of innocence, he is claiming that he is entitled to relief despite a constitutionally , valid conviction .... In light of the presumption of guilt that attaches after a constitutionally valid conviction, ‘it is fair to place on [a petitioner asserting a freestanding claim of innocence] the burden of proving his innocence, not just raising doubt about his guilt.’ ”) (quoting Herrera, 506 U.S. at 443, 113 S.Ct. at 883) (Blackmun, J., dissenting); Gould v. Commissioner of Correction, 301 Conn. 544, 22 A.3d 1196, 1206 (2011) (“Our use of the term ‘actual innocence’ is of paramount significance. Actual innocence also referred to as factual innocence is different than legal innocence. Actual innocence is not demonstrated merely by showing that there was insufficient evidence to prove guilt beyond a reasonable doubt.”) (internal citation omitted).
At a minimum, -however, the Conway standard requires the petitioner to satisfy the test of actual innocence established by the United States Supreme Court as the gateway for considering in federal habeas corpus review of final state court convictions claims of constitutional error otherwise proeedurally barred by state law or by expiration of a statute of limitations. McQuiggin v. Perkins, 569 U.S.-, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013); House v. Bell, supra; Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). Although that standard does not require the habeas petitioner to prove factual innocence as if it were a freestanding claim, “tenable actual-innocence gateway pleas are rare: ‘a | )0petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.’ ” McQuiggin, 569 U.S. at-, 133 S.Ct. at 1928 (quoting Schlup, 513 U.S. at 329, 115 S.Ct. at 868). Under this gateway standard, “the newly presented evidence may indeed call into question the credibility of the witnesses presented at trial. In such a case, the habeas court may have to make some credibility assessments.” Schlup, 513 U.S. at 330, 115 S.Ct. at 868. A credible gateway claim nevertheless requires “ ‘new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence— that was not presented at trial.’ ” House, 547 U.S at 537, 126 S.Ct. at 2077 (quoting Schlup, 513 U.S. at 324, 115 S.Ct. at 865).
At this extraordinary level, respondent must show in the present case more than a probability that reasonable jurors might divide over the question of C.C.’s credibility in light of the new evidence. As respondent readily concedes, he lacks new reliable scientific evidence, eyewitness testimony, or critical physical evidence of such persuasiveness that no reasonable juror would have convicted in light of the new evidence that did not, in any event, amount to C.C.’s repudiation of any of her trial testimony against him. And, as the state has argued throughout these post-conviction proceedings, respondent has not made an affirmative case of “conclusive exoneration.” House, 547 U.S. at 553, 126 S.Ct. at 2086.
Second, respondent has also failed to show that he was deprived of the opportunity to file a motion for new trial on grounds of newly discovered evidence and thereby deprived of a lower standard of materiality than Conway requires because his new evidence, even if not establishing actual innocence, “would probably have changed the verdict or judgment of guilty” *410 had it been introduced at |ntrial. La. C.Cr.P. art. 851(8); see State v. Prudholm, 446 So.2d 729, 736 (La.1984) (“The trial judge’s duty [under art. 851(8) ] is not to weigh the new evidence as though he were a jury determining guilt or innocence, rather his duty is the narrow one of ascertaining whether there is new material fit for a new jury’s judgment.”); see also State v. Cavalier, 96-3052, pp, 3-4 (La.10/31/97), 701 So.2d 949, 951 (“Newly discovered evidence affecting only a witness’s credibility ‘ordinarily will not support a motion for a new trial, because new evidence which is merely cumulative or impeaching is not, according to the often-repeated statement of the courts, an adequate basis for the grant of a new trial.’ Nevertheless, the court possesses the discretion to grant a new trial when the witness’s testimony is essentially uncorroborated and dispositive of the question of guilt or innocence and it appears that had the impeaching evidence been introduced, it is likely that the jury would have reached a different result.”) (quoting Mesarosh v. United States, 352 U.S. 1, 9, 77 S.Ct. 1, 5, 1 L.Ed.2d 1 (1956) (other internal quotation marks and citations omitted)). In the present case, the district court appears to have used this lower standard of materiality under the guise of implementing a Conway claim of actual innocence.
We have recognized that a prosecutor’s duty to disclose material exculpatory evidence does not end with a jury’s verdict and that “ ‘after a conviction the prosecutor also is bound by the ethics of his office to inform the appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction.’ ” State v. Ortiz, 11-2799, p. 6 (La.1/29/13), 110 So.3d 1029, 1033 (quoting Imbler v. Pachtman, 424 U.S. 409, 427, n. 25, 96 S.Ct. 984, 993, 47 L.Ed.2d 128 (1976)). Prosecutor Rhodes acknowledged the existence of that duty but we need not resolve whether March 2011 afforded him the first opportunity to disclose the information, or whether, as Detective Daigle’s | ^testimony suggested and respondent argues, he learned of C.C.’s allegations against Michael Percle much earlier, by the end of 2009, and failed to disclose the information promptly. Rhodes was chargeable with knowledge of C.C.’s allegations against Percle because the Terre-bonne Parish Children’s Advocacy Center had conducted the interview of C.C. in respondent’s case and thus was in a position to evaluate the broader implications of her subsequent accusations against Percle in November 2009. See Strickler v. Greene, 527 U.S. 263, 281, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999) (“In order to comply with Brady [v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ] ... ‘the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government’s behalf in this case, including the police.’ ”) (quoting Kyles v. Whitley, 514 U.S. 419, 437, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490 (1995)).
Even assuming, however, that Rhodes had a duty to disclose C.C.’s allegations against Michael Percle as soon as she made them, and wholly apart from the question of whether the new evidence actually satisfied the lower standard of materiality required by La.C.Cr.P. art. 851(3), the time for respondent to file a motion for new trial based on newly discovered evidence had already passed. A motion for new trial ordinarily must be filed and disposed of before sentence, but if it is based on newly discovered evidence, the motion may be filed “within one year after verdict or judgment of the trial court, although a sentence has been imposed or a motion for a new trial has been previously filed.” La. *411 C.Cr.P. art. 853. The time limit imposed by art. 853 does not raise any due process concerns. Herrera, 506 U.S. at 409-10, 113 S.Ct. at 864-65 (discussing the divergent time limits at the federal and state level on motions for a new trial based on newly discovered evidence and finding no due process concerns raised by the 60-day limit employed in Texas and 16 other states); State v. Reed, 97-0812, pp. 18-19 (La.App. 1 Cir. 4/8/98), 712 So.2d 572, 582-83 (noting that “it is the legislative prerogative to set reasonable procedural formalities and requirements such as the time limitations provided in article 853,” and rejecting defendant’s claim the one-year limit in art. 853 deprived him of his constitutional rights to judicial review, access to the courts, and due process). The article further provides that “if an appeal is pending the court may hear the motion only on remand of the case.”
In the present case, the jury returned its verdict on June 20, 2008. C.C.’s allegations against Michael Percle came to light at the end of October 2009, and the interview with the Children’s Advocacy Center then took place on November 5, 2009, well over a year after the jury returned its verdict. Article 853 plainly contemplates the filing of a motion for new trial during pendency of an appeal, i.e. at a time when the conviction and sentence are not final. Thus, finality of conviction and sentence on appeal relates only to when the motion may be heard, not when it may be filed. Cf. State v. Bolton, 408 So.2d 250, 254 (La.1981) (phrase “verdict or judgment of the court” in La.C.Cr.P. art. 853 means only “a finding of guilt or innocence,” and thus “does not include sentencing;” rejecting defendant’s claim that a motion for a new trial on grounds of newly discovered evidence filed more than one year after verdict but less than one year after sentencing is timely filed); see also State v. Jackson, 09-0045, pp. 12-13 (La.App. 3 Cir. 10/7/09), 19 So.3d 631, 638-39 (discussing Bolton). The timing of prosecutor Rhodes’s disclosure to respondent’s appellate counsel thus had no bearing on the opportunity of respondent to file a motion for a new'trial based on C.C.’s new allegations against Percle because the time for filing the motion had already run from the date the jury returned its verdict before she made the allegations.
114The passage of time, and not prosecutor Rhodes, thus dictated that respondent cast his lot with the extraordinarily high Conway standard as a basis for overturning his conviction and sentence in state post-conviction proceedings. As respondent readily concedes, he cannot meet that standard. Nor can he possibly show, as a ground for affording him a new trial, that a Confrontation Clause error occurred at trial on the basis of a statement made nearly two years after the fact. The Confrontation Clause of the Sixth Amendment guarantees only “an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish.” United States v. Owens, 484 U.S. 554, 559, 108 S.Ct. 838, 842, 98 L.Ed.2d 951 (1988) (internal quotation marks and citations omitted).
Respondent’s conviction and sentence are therefore reinstated and this case is remanded to the district court for consideration of respondent’s remaining claims for post-conviction relief.
CONVICTION AND SENTENCE REINSTATED; CASE REMANDED