PER CURIAM:
11 Writ denied. In 1996, Chester and co-defendant Elbert Ratcliff were charged by grand jury indictment, each with first degree murder, arising from the shooting death of taxi driver John Adams. A Jefferson Parish jury found Chester guilty as charged and unanimously agreed to impose a sentence of death based on the aggravating circumstance that he committed the murder during an armed robbery or attempted armed robbery.[1] This Court affirmed the conviction and sentence, State v. Chester, 97-2790 (La. 12/1/98), 724 So.2d 1276, after which the United States Supreme Court denied certiorari. Chester v. Louisiana, 528 U.S. 826, 120 S.Ct. 75, 145 L.Ed.2d 64 (1999), reh’g denied, 528 U.S. 999, 120 S.Ct. 457, 145 L.Ed.2d 377 (1999).
The evidence at Chester’s trial showed that during the early morning hours of December 27, 1995, Adams was found in his taxi with one gunshot wound to |athe back of the head. A pool of blood had gathered on the floorboard and there was blood spatter on surfaces within the driver’s side of the vehicle. Adams’s business cards were scattered around his body, just under $300 cash was left in his pockets, and a white plastic bag containing a Guess brand shirt was hanging from the handle of the rear driver’s side door. Police discovered co-defendant Ratcliffs finger *342 prints on some of the business cards and arrested him on March 6, 1996. Ratcliffs statements led investigators to identify Teddy Chester as a person of interest.
On March 18, 1996, police received a disturbance call from a female later identified as Kaprice Pollard who reported that her sister’s boyfriend was refusing to leave her apartment. She also told police that the man had been involved in a recent homicide. When the deputy arrived, he met outside the apartment with Kaprice and her sister, Quinice Pollard. Kaprice stated that the man inside the bedroom of the apartment was Teddy Chester, Quin-ice’s boyfriend, and that he was involved in the recent homicide of a taxi driver. As the officer entered the apartment he saw someone jump out through the bedroom window. Chester was apprehended and arrested shortly thereafter.
Quinice told police that Chester came to see her on the night of Adams’s murder and told her that he and Ratcliff had been involved in a robbery and that Ratcliff shot the victim. Later, while doing Chester’s laundry, she noticed blood on his pants. When she questioned Chester, he replied that he had been in a fight. Her sister Kaprice told police that Chester came to the apartment on the night of the murder and took Quinice into the bathroom to talk. Kaprice reported that she listened at the door and had overheard Chester telling Quinice that he shot a taxi driver. Based on these conversations, and while Chester was being held by police, police obtained a warrant to search the house where Chester’s sister lived and he Issometimes stayed. Pursuant to the search, police seized a baseball cap with blood stains on it and a pair of jeans. DNA analysis later determined that neither Adams nor Chester could be excluded as the source(s) of the blood on the baseball cap.
After execution of the search warrant, Chester was advised of his rights and interviewed, giving two statements. In the first, he related that on December 27, 1995, he met with Ratcliff who was seeking to sell or trade a Guess shirt in a plastic bag for money or crack cocaine. Chester walked down the street until he saw Adams’s taxi, entered the taxi on the rear passenger side, and asked Adams if he wanted to buy some crack. Adams declined and Chester exited the taxi. Chester stated that he then saw Ratcliff flag down the taxi, enter the rear driver’s side, and press a revolver to Adams’s head. After a brief struggle, Ratcliff disconnected the taxi radio and shot Adams in the head. While Chester hid behind a tree, Ratcliff exited and opened the driver’s door. Ratcliff threatened to kill Chester if he told anyone.
After this first statement, investigators told Chester about the baseball cap with blood on it. Chester then gave a second statement in which he admitted he was inside the taxi when Adams was shot. He again stated that he had entered on the rear passenger side, keeping one leg outside on the ground. He stated that Ratcliff then entered on the rear driver’s side. Chester asked Adams if he wanted to buy drugs and the victim declined. Chester admitted he would have sold Adams a fake rock of cocaine if he had been interested. Ratcliff then asked Adams if he wanted to buy anything and Adams again declined. Ratcliff told Adams, “well, Mother F**ker give it up” and placed a revolver to the back of Adams’s head, whereupon Adams said, “oh, lord not this, not this. Oh lord not this.” Ratcliff then disconnected the taxi radio and shot Adams. Chester noticed blood spattered on him. The taxi, which had been moving forward, hit a pole and stopped. Chester Lexited from the driver’s side and ran behind a tree. After *343 Ratcliff threatened Chester not to tell anyone, the two parted ways.
At trial, the state presented the DNA analysis of the blood on Chester’s cap. Prosecution witnesses testified that blood spatter was found in and around the rear driver’s side, but none was found on the rear passenger side, which indicated the shooter was seated in the rear driver’s side, not the passenger side, and further that Chester had been dishonest when he stated he was in the rear passenger side, because no blood was found there and Chester’s clothing and cap contained blood.
The jury also heard testimony from the Pollard sisters. Quinice testified that she initially told police that Chester told her Ratcliff shot the taxi driver; however, she changed her testimony two weeks before trial to state that Chester had confessed to her that he was the shooter. She stated that she changed her account because her conscience was bothering her. When questioned by defense counsel why she initially told police that Ratcliff killed Adams, she stated that she was afraid of Chester and he told her to say these things. The prosecution also introduced portions of letters that Quinice received from Chester while he was incarcerated and awaiting trial. In the letters, Chester urged Quinice to change her testimony and to convince Ka-price to do so also, or not attend trial. One of the letters contained a threat .to Quinice that he could still get to her from prison.
Kaprice’s trial testimony was similar to her initial statement, that on the night of the murder she overheard Chester tell Quinice that he shot a taxi driver. She further testified that Quinice later told her that Chester was trying to rob a taxi driver and he shot him because the driver was trying to pull off with his drugs.
Chester filed his first post-conviction application in 2000 and has since filed numerous additional pleadings, including counseled supplements raising substantive claims and. pro-se motions to terminate counsel and/or proceed pro se, Rto waive further review, and/or to expedite these proceedings. Amidst the litany of his prose requests, the District Court reviewed and dismissed all pending substantive claims for post-conviction relief on July 21, 2010, and .subsequently denied a request to reconsider its ruling. The District Court stated specifically that it was dismissing all claims that were litigated on appeal but that it would remain open to further non-repetitive claims. In October 2011, Chester filed additional pro-se pleadings, followed by counseled supplements in 2012 and 2014. The state responded with procedural objections and substantive answers, and the District Court ordered an evidentiary hearing to resolve the limited issue of Chester’s alleged intellectual disability.
After a multi-day intellectual disability hearing in November 2013 (the “Atkins hearing”), the District Court dismissed that claim because it found Chester failed to demonstrate that he suffers from impaired adaptive skills or that his intelligence, as indicated by at least one IQ score of 95, is substantially below average. Subsequently, the District Court conducted a contradictory hearing to assess the need for further evidentiary hearings, after which it issued a -20-page ruling summarily dismissing all remaining claims.
We have reviewed Chester’s claims and the District Court’s reasons for rejecting them and have found no reason to disturb the District Court’s ruling.[2]
*344 Ineffective assistance of counsel. Chester maintains that trial counsel rendered ineffective assistance and urges the District Court erroneously rejected his numerous complaints about her performance.
RTo demonstrate an entitlement to post-conviction relief based on counsel’s ineffectiveness, a petitioner must show both that (1) counsel’s performance fell below objective standards of reasonableness according to prevailing professional norms; and (2) the inadequate performance prejudiced him to the extent trial was rendered unfair and the verdict suspect. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
Chester urges that counsel erred in litigating the motion to suppress his custodial statements, in which he admitted his presence during the shooting, because she failed to show the statements were not made pursuant to a valid waiver.[3] He asserts he was a scared 18-year-old with intellectual disabilities, circumstances which should have prompted counsel to argue that he could not have understood his rights well enough to knowingly and intelligently waive them.
The state bears the burden of proving that a defendant knowingly and intelligently waived his privilege against self-incrimination, but the defendant bears the burden of proving any mental abnormality which he alleges rendered his statement per se involuntary. State v. Green, 94-0887, p. 6 (La. 5/22/95), 655 So.2d 272, 279; State v. Brooks, 92-3331, p, 12 (La. 1/17/95), 648 So.2d 366, 373. At the suppression hearing, Detective Sacks testified that he advised Chester of his Miranda rights and read a waiver form, which Chester signed after verifying that he understood. Chester, 97-2790, p. 6, 724 So.2d at 1281. Thus, because Chester expressly waived his rights, the question is whether his waiver was knowing and intelligent under the totality of the circumstances, including his “background, experience, and conduct;” his alleged diminished capacity is but one factor to consider. Green, 94-0887, pp. 10-11, 655 So.2d at 280 (internal citation omitted, quoting Oregon v. Bradshaw, 462 U.S. 1039, 1044-46, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983) and Solem v. Stumes, 465 U.S. 638, 647, 104 S.Ct. 1338, 1344, 79 L.Ed.2d 579 (1984)).
Detective Sacks testified that Chester appeared completely coherent and, before giving his second statement in which he placed himself inside the taxi, was again advised of his rights and waived them once more. Chester’s conduct thus indicated he made a knowing and intelligent waiver. His assertion that it was nevertheless invalid because of his youth and low intellect, as evinced by his reading and language comprehension deficits, without more, is insufficient to vitiate his waiver. See State v. Brown, 414 So.2d 689, 696 (La. 1982) (“Moderate mental retardation and low intelligence or illiteracy do not of themselves vitiate the ability to knowingly and intelligently waive constitutional rights and make a free and voluntary confession.”) (citations and internal quotes omitted); see also State v. Holmes, 06-2988, pp. 20-21, 43 (La. 12/2/08), 5 So.3d 42, 59-60, 72-73 (defendant with IQ of 77 and fetal alcohol *345 syndrome made knowing and intelligent waiver); Green, 94-0887, pp. 7-19, 655 So.2d at 278-84 (mildly retarded defendant’s waiver was knowing and intelligent, despite psychologist’s testimony that he was unable to comprehend his rights, because psychologist also testified he was educable and could be made to understand, and officers testified he understood, at least partially because of his criminal history); compare State v. Istre, 407 So.2d 1183, 1186-87 (La. 1981) (19-year-old with IQ of 68 who did not know his own age intelligently waived his rights, which were explained in simplistic terms); and State v. Anderson, 379 So.2d 735, 736 (La. 1980) (fact that defendant was an illiterate, unemployed 17-year-old with the mental age of 8 and an IQ between 50 and 69, coupled with ambivalent police testimony about whether |8he understood the rights, supported conclusion he was incapable of executing a valid waiver). Under the circumstances, we find that the state would have carried its burden of proving that Chester’s waiver was knowing and intelligent, had trial counsel attacked the statements’ admissibility on these grounds. Thus, Chester cannot show that his motion to suppress would have been granted but for trial counsel’s omission. See generally Ortiz-Sandoval v. Clarke, 323 F.3d 1165, 1170 (9th Cir. 2003) (petitioner must show the overlooked motion would have been meritorious and a reasonable probability of a different verdict absent the alleged error) (citing Kimmelman v. Morrison, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986)).
Next, Chester claims counsel erred by failing to move for exclusion of the letters he sent his girlfriend, Quinice, on the ground that he was prejudiced by their redacted format. Specifically, he urges the redacted versions gave the impression that he sought to intimidate Quinice before trial, whereas in their entirety the letters would have shown he was trying to ensure that she continued to tell the truth, i.e. that Ratcliff was the shooter.
As the District Court found, this Court addressed a similar claim on appeal. See Chester, 97-2790, p. 17, 724 So.2d at 1287. In State v. Lee, 14-2374, pp. 8-9 (La. 9/18/15), 181 So.3d 631, 638, another capital post-conviction case, we explained that an attempt to re-litigate a claim previously disposed of, by couching it as an ineffective assistance of counsel claim, will generally fail because the underlying issue has already been fully litigated. La.C.Cr.P. Art. 930.4(A); see also State v. Blank, 16-0213, pp. 2-3 (La. 5/13/16), 192 So.3d 93, 96-97. However, in this case, the appellate analysis of this issue was truncated because trial counsel failed to proffer the omitted portions of the letters. Chester, 97-2790, pp. 19-20, 724 So.2d at 1287-88. Thus, this discrete ineffective assistance of counsel claim cannot be fairly characterized as having been fully litigated on appeal. Nevertheless, even a claim erroneously dismissed on procedural grounds is generally unworthy of remand if it appears legally or factually weak. See La.S.Ct.R. X, § 1(a)(4) (writ grant based on lower court’s erroneous interpretation or application of law generally not warranted unless the error “will cause material injustice or significantly affect the public interest.”); Blank, 16-0213, p. 2, 192 So.3d at 96 (citing State v. Singer, 09-2167, pp. 1-2 (La. 10/1/10), 45 So.3d 171, 171-72).
As for the letters being presented in redacted form, in State v. Duke, 97-3059 (La. 10/30/98), 724 So.2d 730, this Court explained the rule of completeness, see R.S. 15:450, which guards against the manipulation of an accused’s statement:
... R.S. 15:450 provides that “[ejvery confession, admission or declaration sought to be used against any one must *346 be used in its entirety, so that the person to be affected thereby may have the benefit of any exculpation or explanation that the whole statement may afford.” The statute embodies “a rule of fairness observed in American jurisdictions.” The principle derives from the common-law rule of completeness. Although opinions differed over the question of “whether the proponent in the first instance must put in the whole” of a statement, there was “and could be no difference of opinion as to the opponent’s right, if a part only has been put in, himself to put in the remainder.” The rule applies to the cross-examination of a witness on the basis of his prior statement as well as to the introduction of a statement in the opposing party’s case in chief....
[T]he rule of completeness serves two purposes: (1) it “secure[s] for the tribunal a complete understanding of the total tenor and effect of the utterance,” and (2) it guards against “the danger that an out-of-context statement may create such prejudice that it is impossible to repair by a subsequent presentation of additional material.”
Id., 97-3059, 724 So.2d at 731 (internal citations and quotations omitted); see also Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 171, 109 S.Ct. 439, 451, 102 L.Ed.2d 445 (1988) (“[Wjhen one party has made use of a portion of a document, such that misunderstanding or distortion can be averted, only through presentation | inof another portion, the material required for completeness is ipso facto relevant and therefore admissible....”).
Chester asserts the portions admitted at trial indicated he wrote to Quinice to coerce her to perjure herself and defend him, whereas at least one redacted portion would have shown that he was, in fact, asking her to remain strong despite prose-cutorial pressure to change her statement and inculpate him. In particular, he excerpts one passage jurors did not see:
Bay I want you to understand these people can’t do you anything, if they say they can, [they’re] just trying to [scare] you so they can get me for something I didn’t do. Also I love you and my love for you isn’t getting any smaller but grew every day, & bay I hope, pray & wish that [yours] for me is doing the same.
(emphasis added).
Even granting that Louisiana law disfavors the piecemeal presentation of an accused’s statement, we find trial counsel’s decision not to draw further attention to the letters and seek their admission in full form was strategic. Although Chester now offers one redacted portion which would have aligned with his defense, the damaging nature of much of the content that was admitted suggests that other redacted portions — which cannot clearly be ascertained from the grainy and largely unintelligible copies provided to this Court — may have been harmful to the defense. Chester has therefore not shown that counsel unprofessionally erred by failing to introduce the letters in complete form. Cf. La.C.Cr.P. Art. 930.2.
Next, Chester claims counsel erred at voir dire by failing to expose potential jurors’ racial bias. He claims there can be no justification for this omission, considering the cross-racial nature of the crime. However, even assuming arguendo that counsel unreasonably failed to pursue this line of questioning, Chester fails to show entitlement to relief because he does not point to evidence that any juror harbored bias or was incapable of serving impai’tially.
^J^jNext, he asserts counsel’s investigation was deficient because she failed to present witnesses whose accounts would *347 have contradicted the state’s case and failed to present evidence that would have undermined the state’s blood spatter theory and demonstrated Ratcliff was the shooter.
Even if this Court agreed with Chester on some independent review of the omitted evidence, counsel’s strategy is unsound only if she failed to adequately investigate the evidence bearing on culpability — taking into account both admissibility and relevance. Strickland, 466 U.S. at 690-91, 104 S.Ct. at 2065-66. Thus, counsel was obligated to conduct a thorough investigation or to make a reasonable decision that a particular avenue of investigation was unnecessary under the circumstances. Although Chester has shown that counsel failed to interview the omitted witnesses, and it is not apparent that counsel’s actions were the product of a reasonable and sound strategy, because we are not convinced that any of the omitted evidence would have affected the verdict, we cannot find this claim warrants relief. Strickland, 466 U.S. at 691,104 S.Ct. at 2066.
Chester next claims he was prejudiced by counsel’s stipulation that the DNA sample from his baseball cap contained a combination of his and the victim’s DNA, and by counsel’s failure to expose the inaccuracy of the state’s DNA results with an opposing expert opinion. According to his post-conviction expert, who has reviewed the state’s DNA data and results (the state’s testing consumed the only sample), contrary to the evidence presented, Chester can be excluded as a contributor to the sample tested, and the statistical likelihood that the victim was a contributor is so low as to render the results presented at trial “a nullity.”
The District Court correctly dismissed this claim, however, given that Chester does not show he was prejudiced by the alleged missteps. That he can be excluded from a sample collected from his own cap does not exculpate him. |iaNotably, he does not dispute his ownership of the cap. Moreover, his assertion that there is low a statistical probability that the victim was the other contributor is too imprecise to warrant relief in a case in which Chester admitted he was inside the taxi during the shooting.[4]
Finally, Chester claims counsel erred at the penalty phase by failing to present a comprehensive explanation of his mental deficits, including his “significant cognitive impairments” and history of substance abuse. Chester complains that the psychiatrist called, Dr. Sarah Deland, was hampered because counsel failed to give her all the necessary information. Chester acknowledges that Dr. Deland provided jurors an extensive overview of his frailties, including: learning disabilities, unstable home environment, lack of supervision as a child, and use of drugs to self-medi *348 cate; but nevertheless faults counsel for permitting the state’s undermining of Dr. Deland on cross-examination and for failing to present more information about his substance abuse problems.[5]
Although a defendant at the capital penalty phase is entitled to the assistance of a reasonably competent attorney acting as a diligent, conscientious advocate for his life, see State v. Fuller, 454 So.2d 119, 124 (La. 1984), by advancing a vague 113argument about counsel’s failure to ensure Dr. Deland made a more compelling case, Chester altogether fails to show that counsel’s penalty phase performance fell below objective professional norms or that, had counsel ensured jurors knew more about Chester’s struggles with substance abuse, they would have reached a different verdict.
Prosecutorial misconduct. Next, Chester claims the prosecution violated Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963), according to which it must disclose evidence favorable to the accused (including impeachment material), by failing to disclose the Pollard sisters’ initial statements which demonstrate that Quinice initially told police that Ratcliff was the shooter and that Kaprice gave inconsistent accounts as to whether it was Chester or Quinice who told her Chester was the shooter. The District Court found this claim should have been raised on appeal because Chester was aware of the sisters’ initial statements and, further, that any undisclosed portions of their statements were immaterial.
Chester acknowledges that in fact the state disclosed the portion of Quinice’s statement in which she initially told police he informed her that Ratcliff was the shooter (which view she had changed by trial). Thus, Chester fails to show that any suppression occurred as to the portion of Quinice’s statement that would have been suitable for impeachment. Moreover, even assuming the state withheld the remainder of both sisters’ initial statements, Chester fails to show it did so in violation of Brady. The only other inconsistencies he points to do not rise to a level capable of undermining the verdict because they pertain to the sisters’ particular recollections about when and how they learned Chester was the shooter — ie., on |uthe night of the crime or the next day — not to the material issue of whether they learned Chester was the shooter.
Next, Chester claims the state knowingly presented perjury from Quinice. He offers a statement from her friend, Sheryl Nelson, asserting Quinice has admitted she lied at trial because “... prosecutors told her they would put her in jail and take away her child.” However, because the courts must view recantations “with utmost suspicion,” State v. Clayton, 427 So.2d 827, 833 (La. 1982), and Nelson’s statement does not rise even to the level of an actual recantation from Quinice but is rather merely a third party assertion that she has since claimed she gave false testimony, Chester has not shown the District Court erred in dismissing this claim.
Chester also claims the prosecutor made prejudicial statements in the penalty phase closing argument, including asking jurors to apply “Biblical law” and calling for “an eye for an eye” retribution. As the District Court found, this Court rejected this claim on appeal, Chester, 97-2790, unpub’d appx., *349 pp. xxii-xxiii, because it was not “firmly convinced” any of the allegedly inflammatory comments contributed to the verdict. Chester fails to show that the interest of justice requires the Court to revisit the issue. La.C.Cr.P. Art. 930.4(A).
Chester next complains of the state’s spoliation or destruction of potentially exculpatory evidence. Specifically, he asserts he was prejudiced by the loss of blood spatter and other evidence in the taxi. As the District Court found, however, this claim is speculative and therefore falls short of the rule articulated in Arizona v. Youngblood, 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988), because he does not show that the evidence was lost as a result of demonstrable bad faith by the state. Moreover, the District Court could have dismissed this claim |1fion the ground that Chester possessed knowledge of it but failed to raise it on appeal. La. C.Cr.P. Art. 930.4(B).
Finally, Chester complains that the DNA results to which the parties stipulated were false because a post-conviction analyst has asserted that he can be excluded as a source of a DNA sample taken from inside his cap. However, as discussed above in connection with his similar ineffective assistance of counsel claim (failure to expose errors in DNA evidence), Chester shows no prejudice as a result, given that — regardless of whether his DNA was detected on an isolated sample taken from the hat, he does not dispute that he owned the hat. To be sure, the probative value of the cap was not that Chester’s DNA was present, but rather that the victim could not be excluded as a source of another DNA profile on it. Although Chester now takes issue with the allegedly low statistical probability that the other profile was in fact the victim’s, he does not sufficiently show that the results presented at trial incorrectly included the victim as a possible contributor. Accordingly, he has shown no prejudice and no ground for relief. The District Court correctly dismissed these claims.
Actual innocence. Next, Chester asserts the District Court erred in dismissing his actual innocence claim, premised on: his view that the DNA evidence was inaccurate; [6] his post-conviction expert’s opinion discrediting Detective Thornton’s blood spatter opinion; and statements of omitted witnesses who would have contradicted the state’s theory.
His attempt to overturn his conviction and sentence by presenting evidence which in his view casts doubt on his guilt falls short of the high standard contemplated in State v. Conway, 01-2808 (La. 4/12/02), 816 So.2d 290, and |1fifurther articulated in State v. Pierre, 13-0873 (La. 10/15/13), 125 So.3d 403, pursuant to which a petitioner must present “new material, noncumulative and conclusive evidence” which “un-dermin[e]s the prosecution’s entire case.” Comway, 01-2808, p. 1, 816 So.2d at 290-91. In evaluating the actual innocence claim in Pierre, this Court clarified that such a free-standing claim must rest on new evidence so compelling that no reasonable juror could have voted to convict with knowledge thereof. Pierre, 13-0873 p. 4, 125 So,3d at 409.
Chester’s new evidence — that his DNA was not detected on the sample taken from his own hat; that Detective Thornton’s opinion about the blood spatter has been undermined by a competing opinion; and that omitted witnesses would have testified to various details indicating Ratcliff was the shooter — is insufficient to satisfy this exacting standard because, even collective *350 ly, it does not show that no reasonable juror could have voted to convict. The District Court reached the correct result when it dismissed this claim.
Juror misconduct. Next, Chester asserts that now-deceased juror Iris Grav-lee,[7] who was allegedly visibly conflicted during the penalty phase deliberations, reached her sentencing decision after consulting a Bible. Chester urges the District Court erred when it found this claim not subject to review under the jury shield law (and harmless, in any event). He also maintains he was prejudiced by the jury conducting experiments during guilt phase deliberations using a mannequin that was introduced at trial to explore bullet trajectories.
Under La.C.E. Art. 606(B), the juror shield law, only evidence related to “outside influences improperly brought to bear upon any juror” or “extraneous prejudicial information improperly brought to the jury’s attention” is fit for ^consideration. In conformity therewith, this Court has found juror testimony and affidavits admissible to prove “well-pleaded allegations of juror misconduct” and the resulting prejudice. State v. Ingram, 10-2274, p. 8 (La. 3/25/11), 57 So.3d 299, 303; see also State v. Hernandez, 14-863, p. 21 (La.App. 5 Cir. 9/23/15), 177 So.3d 342, 356 (“Outside influence” about which juror is permitted to testify to determine whether misconduct deprived defendant of constitutional rights, refers to factor originating outside courtroom proceedings which influences deliberations, such as statement made by a bailiff to the jury or introduction of prejudicial newspaper account into jury room).
Applying this rule, the District Court erred in finding the evidence pertaining to a juror’s consultation of the Bible inadmissible but reached the correct result in declining to consider evidence to support Chester’s claim that jurors engaged in “unauthorized experiments” using the mannequin shown during closing argument.
In urging that jurors’ manipulation of the mannequin constituted a prejudicial extraneous influence, subject to exploration, Chester cites United States v. Beach, 296 F.2d 153, 158-59 (4th Cir. 1961), for the proposition that “a case must be decided upon evidence submitted in court during the trial and not upon private experiments of the jurors.” However, a review of Beach reveals that the rule discussed therein is more nuanced than Chester portrays. The court in that case explained that although jurors “may not conduct experiments which have the effect of putting them in possession of evidence not offered at the trial,” the “mere making of a more critical examination of an exhibit than was made during the trial is not objectionable” so long as the effect is not to place the jury in possession of evidence not introduced at trial. Beach, 296 F.2d at 158-59. Because Chester does not allege that jurors conducted any experiment which effectively gave rise to 11sevidence other than that presented at trial, he fails to show any basis for examining the jury’s deliberations as to this issue. La.C.E. Art. 606(B).[8]
*351 As to the substance of the Bible consultation claim, this Court, along with a majority of federal courts, has taken the position that a juror crosses a line by actively consulting a Bible during deliberations, particularly in cases in which they use Biblical injunctions governing conduct similar to the conduct at issue. See State v. Langley, 95-1489, p. 40 (La. 4/14/98), 711 So.2d 651, 675 (denying relief because Langley “[did] not suggest that the Bible was used to find justification for sentencing the defendant to death.”); see also Oliver v. Quarterman, 541 F.3d 329, 331, 336-40 (5th Cir. 2008) (collecting cases); Fields v. Brown, 503 F.3d 755, 795 (9th Cir. 2007) (collecting cases) (“As to the procedural propriety of consulting the Bible during deliberations, federal and state appellate courts generally agree when engaging in de novo review, that a jury engages in the unconstitutional consultation of extrinsic material by introducing the Bible into deliberations during a capital trial.”). However, a petitioner advancing such a claim does not enjoy a presumption of prejudice but must show that the Bible (or other outside influence) had a “substantial and injurious” bearing upon a juror’s verdict. La.C.E. Art. 606(B).
11 sHere, Chester fails to make the required showing of a substantial and injurious effect on the verdict because, although he asserts his post-conviction interviews with Foreperson Guillot and Juror Lawson contained detailed descriptions of their observations of Gravlee’s consultation of a Bible after an overnight recess, which allegedly led Gravelee to decide her penalty phase vote, Chester has not provided the necessary proof to substantiate his allegations. Even setting aside whatever practical concerns may arise from the fact that Gravlee has since passed away, no affidavits from Guillot or Lawson were attached as exhibits to the instant application. Because Chester has not substantiated his assertions, he fails to show any grounds for remand.
Intellectual disability. Next, Chester claims the District Court erred when it found he failed to prove he is intellectually disabled and therefore exempt from capital punishment. Chester asserts he has satisfied all three prongs of the intellectual disability standard; the Social Security Administration diagnosed him as mentally retarded at age 14; he reported an IQ score of 68 when he applied for continuing Social Security benefits in 1996; and his post-conviction expert, Dr. Stephen Greenspan, has opined he is intellectually disabled.
Whatever the merits of this claim, because Chester failed to timely seek review of the District Court’s December 5, 2013, ruling dismissing it, it is no longer subject to review. The time for filing an application for review of a judgment is “within thirty days of the mailing of the notice of the original judgment,” and “[n]o *352 extension of time therefor will be granted.” La.S.Ct.R. X, § 5(a). This Court considers the rule jurisdictional in nature and enforces it strictly against counseled applicants. State v. Matthews, 02-1121 (La. 2/13/04), 868 So.2d 21.
|2nIn any event, even assuming ar-guendo that the claim was properly before the Court, Chester has failed to show that the District Court erred. In Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the United States Supreme Court held that the execution of mentally retarded persons (now referred to as intellectually disabled) constitutes excessive punishment, and therefore violates the Eighth Amendment. As implemented in Louisiana, intellectual disability is a three-part condition shown by establishing: (1) sub-average intelligence and (2) significant impairment in several areas of adaptive skills which (3) manifested during the developmental stage. State v. Williams, 01-1650, pp. 22-24 (La. 11/1/02), 831 So.2d 835, 853-54.[9]
The District Court conducted Chester’s Atkins hearing on November 12-15, 2013, during which it heard testimony from several defense witnesses (including friends, relatives, and Dr. Greenspan) and two state experts. Providing detailed reasons for dismissing the claim, the District Court found:
The family witnesses who testified as to Petitioner’s childhood did not relay sufficient evidence to support a finding of mental retardation. The examples of Petitioner’s childhood behavior (not voluntarily bathing, inability to fry food or cook at a young age, not able to use tools, etc...) did not indicate that Petitioner was mentally retarded nor reveal any atypical behavior of a young boy. Furthermore, the reliability of the testimony is suspect as these witnesses were asked to relay situations that occurred some [20 to 30] years ago at times when some of the witnesses themselves were children.... The credibility of these witnesses is also questionable, as Petitioner’s family members are likely motivated to testify to enable Petitioner to be spared the death penalty.
As to Petitioner’s testifying expert witnesses, thefy] failed to perform any testing or conduct any interviews of Petitioner. The adaptive testing performed was based solely upon family members’ telephone | ⅞1 interview responses. Again, the reliability and credibility of the information provided is questionable.
Moreover, Petitioner’s expert witness agreed that [his] IQ to date is in the average range (estimated IQ 95). As to the non-testifying expert report relied upon by Petitioner’s testifying experts, the court found Dr. Young’s reported conclusions about Petitioner’s abilities not credible and inconsistent with the evidence and the court’s own observations of Petitioner....
Having found some of Chester’s witnesses lacking credibility, the District Court credited the state’s “ample evidence that Petitioner is not mentally retarded,” in particular Dr. Katie Ard’s testimony that, based on her testing, Chester has an IQ of 96, and Dr. Raphael Salcedo’s testimony that Chester has demonstrated “no significant *353 limitations -with respect to intellectual and adaptive functions.”
Recently in Brumfield v. Cain, 808 F.3d 1041, 1057 (5th Cir. 2015), cert. denied, — U.S. -, 136 S.Ct. 2411, 195 L.Ed.2d 781 (2016), the Fifth Circuit reviewed and affirmed a federal District Court’s determination that another Louisiana death row inmate, Kevan Brumfield, was intellectually disabled, explaining at the outset:
[W]hether a defendant is intellectually disabled is inherently an intensively factual inquiry. Because intellectual disability is a factual finding, this court reviews a district court’s determination that an individual is intellectually disabled for clear error. A finding is clearly erroneous only if it is implausible in the light of the record considered as a whole. If the district court’s account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.
Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be clearly erroneous. The Supreme Court has explained that: When a trial judge’s finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error. This court cannot second guess the district court’s decision to believe one witness’ testimony over another’s or to discount a witness’ testimony, and is thus reluctant to set aside findings that are based upon a trial judge’s determination of the credibility of witnesses.
Brumfield, 808 F.3d at 1057 (internal citations and quotations omitted).
|22Here, post-conviction counsel're-urges the supporting evidence and asks this Court to find it more persuasive than the District Court did. Chester emphasizes that the District Court “unreasonably rejected the testimony of all of [his] family members,” and discredited his lower IQ score because it was obtained for the sole purpose of applying for Social Security benefits. After asking this Court to reevaluate credibility issues resolved by the District Court, post-conviction counsel further asserts that, even if this Court finds Chester’s deficits do not show he is intellectually disabled, “they nonetheless constitute such significant impairments that [his] execution would violate the Eighth Amendment’s prohibition against cruel and unusual punishment” because Chester, who was just 18 at the time of the offense had less capacity to control his conduct and is therefore not deserving of the harshest punishment available. Despite these urgings, however, this Court is not convinced it should break with convention and “second guess the district court’s decision to believe [the state’s expert witnesses] over [his].” Brumfield, 808 F.3d at 1057.[10]
*354 | ¾¾Cumulative error. Finally, Chester claims this Court should grant relief in light of the cumulative effect of the errors discussed herein. The District Court rejected this catch-all argument as repetitive under La.C.Cr.P. Art. 930.4(A) because this Court rejected a similar argument on appeal, Chester, 97-2790, unpub’d appx., p. xxxv, but, even assuming the claim was not repetitive, it warrants no further attention. Though this Court has often reviewed cumulative error arguments, it has never endorsed them. Instead, it has universally found harmless errors, however numerous, do not aggregate to reach the level of reversible error. See, e.g., State v. Strickland, 94-0025 (La. 11/1/96), 683 So.2d 218, 239; State v. Taylor, 93-2201, (La. 2/28/96), 669 So.2d 364 (unpub’d appx.); State v. Tart, 93-0772, p. 55 (La. 2/9/96), 672 So.2d 116, 164; State v. Copeland, 530 So.2d 526, 544-45 (La. 1988) (citing State v. Graham, 422 So.2d 123, 137 (La. 1982); State v. Sheppard, 350 So.2d 615, 651 (La. 1977)). Other courts have reached the same conclusion. See, e.g., Mullen v. Blackburn, 808 F.2d 1143, 1147 (5th Cir. 1987) (court rejects cumulative error claim and finds that “twenty times zero equals zero”); Foster v. State, 639 So.2d 1263, 1303 (Miss. 1994) (finding no “near errors” and so rejecting cumulative error analysis). We find no basis to depart from our established policy.
Chester has now fully litigated his application for post-conviction relief in state court. Similar to federal habeas relief, see 28 U.S.C. § 2244, Louisiana post-conviction procedure envisions the filing of a second or successive application only under the narrow circumstances provided in La.C.Cr.P. Art. 930.4. Notably, the Legislature in 2013 La. Acts 251 amended that article to make the procedural bars against successive filings mandatory. Chester’s claims have now been fully litigated in accord with La.C.Cr.P. Art. 930.6, and this denial is final. Hereafter, |g4unless he can show that one of the narrow exceptions authorizing the filing of a successive application applies, he has exhausted his right to state collateral review. The District Court is ordered to record a minute entry consistent with this per curiam.
WEIMER, J., dissents and assigns reasons.
HUGHES, J., dissents for reason assigned by Weimer, J.

. After Chester was convicted and sentenced to death, the state reduced the pending first degree murder charge against Ratcliff to second degree murder. Another Jefferson Parish juiy found Ratcliff guilty as charged and the court sentenced him to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.

. Consistent with La. Const. Art. V, § 5(D), which grants this Court exclusive appellate jurisdiction in cases in which a death sentence has been imposed, and considering that capital cases qualify as “extraordinary” for purposes of La.S.Ct.R. X, § 5(b), this Court *344 has invariably entertained writ applications after a death sentence has been imposed and the petitioner has bypassed the intermediate court of appeal.

. In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L,Ed.2d 694 (1966), the Supreme Court declared that a condition precedent to obtaining an admissible custodial statement is that the suspect be informed of his right to remain silent and consult with an attorney and that he gave the statement only after knowingly and intelligently waiving those rights.

. The District Court did not err in dismissing his remaining complaints about counsel’s guilt phase performance because, as the District Court found, the following issues were addressed on appeal:
• Counsel labored under a conflict of interest because she worked for the same public defender's office that represented Rat-cliff;
• Counsel erred in opening the door to Rat-cliff's statement indicating Chester was present in the taxi;
• Counsel failed to object to the evidence of his flight when police arrived at the Pollard residence;
• Counsel failed to protect Chester from the forcible collection of a sample for DNA testing;
• Counsel failed to object to presentation of victim impact evidence during the guilt phase; and
• Counsel erred when she failed to object to the state’s opening and closing arguments on the basis that they exceeded the scope of the evidence presented.

. Chester's trial pre-dated the Supreme Court's decision in Atkins that mentally retarded (or intellectually disabled defendants, as they are now termed) are exempt from capital punishment. Thus, counsel’s failure to more specifically argue intellectual disability was not contrary to law or professional norms.

. As the District Court found in rejecting this claim, Chester contested the reliability of the methodology of the DNA testing on appeal. Chester, 97-2790, unpub’d appx., pp. xi-xii.

. Post-conviction counsel has deduced this is the juror at issue because those who have recounted her actions and statements have consistently described her as “an older female;” of the jurors, Gravlee best fit that description.

. Moreover, Chester does not show any extraneous influence in asserting that Foreperson Guillot knew “a lot about ballistics” and therewith prejudicially affected the verdict, because Guillot’s personal knowledge is precisely the sort of information upon which jurors are called to draw in making findings of fact. See, e.g., United States v. Gonzales, No. *351 92-2118, 1993 WL 185718 at *7 (5th Cir. 1993) (verdict may be impeached only by evidence that it was influenced by outside sources; juror’s knowledge of Spanish, which allowed him to translate part of an audiotape in evidence, stemmed from personal experience and was therefore not from an extrinsic source); Bibbins v. Dalsheim, 21 F.3d 13, 17 (2d Cir. 1994) (jurors may bring to the jury room knowledge gained from ordinary experience, such as knowledge that "Times Square is busy all night or that there are doormen along stretches of Park Avenue”); United States v. Holck, 398 F.Supp.2d 338, 364-67 (E.D. Pa. 2005) ("jurors can and should draw upon prior life experiences and use them in the course of deliberations,” and “[sjuch conduct does not amount to bringing in extraneous information”); see also Marquez v. City of Albuquerque, 399 F.3d 1216, 1223 (10th Cir. 2005) (juror’s personal experience training police dogs not "extraneous prejudicial information.”).

. This Court applied Atkins in Williams, 01-1650, 831 So.2d 835, and thereafter, the Louisiana legislature promulgated La.C.Cr.P. Art. 905.5.1 to provide a procedure when a defendant facing capital punishment claims to be intellectually disabled, before trial. The dictates of Williams still govern post-conviction intellectual disability claims in cases, like this, in which the death sentence pre-dates Atkins. See State v. Dunn, 07-0878, p. 6 (La. 1/25/08), 974 So.2d 658, 662 (because the legislature has not enacted a procedure for post-sentencing Atkins claims, the law in such cases remains as it was when Williams was decided),

. Further, because of his diminished mental capacity, Chester asserts his maturity is less than his chronological age and therefore his death sentence is cruel and unusual. However, in Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), in which the Supreme Court held that "the death penalty cannot be imposed upon juvenile offenders, 543 U.S. at 575, 125 S.Ct. at 1198, the Supreme Court drew the line between juvenile and adult offenders at the age of 18. 543 U.S. at 574, 125 S.Ct. at 1197. Because Chester was 18, he was not legally a juvenile. Nonetheless, he claims that because of his immaturity there is little difference between himself and an offender who committed murder before age 18. However, when the Supreme Court drew the line at age 18, it was *354 well aware that "objections [are] always raised against categorical rules,” id., 543 U.S. at 574, 125 S.Ct. at 1197, and, although Chester cannot benefit from the categorical prohibition in Roper, he had an opportunity to present his immaturity as a mitigating circumstance at the penalty phase. See United States v. Mitchell, 502 F.3d 931, 981 (9th Cir. 2007) (finding it “may well be true that [defendant] is less mature than the average 20 year old. But whether true or not, and whether that mitigates against his crime, is a question the Constitution permits to be answered on a case-by-case basis.”). This Court rejected substantially the same argument in State v. Tucker, 13-1631, p. 52 (La. 9/1/15), 181 So.3d 590, 628 ("Defendant, in essence, argues that his two near misses at qualifying for the categorical prohibitions established in Roper v. Simmons and Atkins v. Virginia, when viewed together, should qualify him for a new categorical prohibition under the Eighth Amendment, as yet unestablished by the U.S. Supreme Court, against executing those who are less culpable because of their immaturity in conjunction with their below average intelligence. As noted above, those considerations are indeed mitigating circumstances that are relevant to the jury’s determination in the penalty phase. But defendant’s argument by post-verdict motion and on appeal that he is less culpable for these reasons is not sufficient to override the jury’s determination that death was the appropriate penalty in this instance.”).