| STATE OF LOUISIANA | * | NO. 2020-K-0617 |
| --- | --- | --- |
| VERSUS | * | |
| | | COURT OF APPEAL |
| JARVIS BALLARD | * | |
| | | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

\* \* \* \* \* \* \*

APPLICATION FOR WRITS DIRECTED TO
ST. BERNARD 34TH JUDICIAL DISTRICT COURT
NO. 208-545, DIVISION "B"
Honorable Jeanne Nunez Juneau, Judge
\* \* \* \* \* \*
**Judge Edwin A. Lombard**
\* \* \* \* \* \*

(Court composed of Judge Edwin A. Lombard, Judge Roland L. Belsome, Judge
Tiffany G. Chase)

Perry M. Nicosia
District Attorney
Megan T. Suffern
Assistant District Attorney
Ashton J. Licciardi
Assistant District Attorney
St. Bernard Parish District Attorney's Office
1101 West St. Bernard Highway
Chalmette, Louisiana 70043

     COUNSEL FOR STATE OF LOUISIANA

Charell Arnold
Richard Davis
Innocence Project New Orleans
4051 Ulloa Street
New Orleans, LA 70119

     COUNSEL FOR DEFENDANT

                            WRIT AFFIRMED IN PART;
                            REVERSED IN PART; VACATED
                            IN PART; AND REMANDED

# JULY 21, 2021

EAL

RLB

TGC

On application for supervisory writ, the defendant/relator Jarvis Ballard seeks review of the district court judgment sustaining the State's procedural objections and dismissing his application for post-conviction relief.   After review of the record in light of the arguments of the parties and applicable law, we grant the relator's writ application, affirm the district court judgment in part, vacate the district court judgment in part, reverse the district court judgment in part, and remand the matter to the district court for an evidentiary hearing on the merits of the relator's claims for post-conviction relief.

***Relevant Facts and Procedural History***

In the early morning hours of January 10, 1998, N.D. called 911 to report a sexual assault and robbery in her home.  The police arrived shortly thereafter and the sixty-year-old victim related that she opened her door at 2 a.m. on the assumption that the knock on her door was her son arriving to pick up his young son.  However, when she opened the door "two black males, one dressed in a red pullover shirt with a hood, the other wearing a dark colored parka style jacket with a hood" shoved their way into the house, raped her (one vaginally, the other both anally and vaginally with his fingers), threatened her, and then left with several

1

electronic items and a ring from her finger. The victim's grandson (who witnessed the assault) told the police he saw only two men. Likewise, the victim's neighbors reported seeing only two men carrying items between the victim's house and a car parked in front of the house.

The victim underwent a sexual assault examination at the hospital to obtain evidence for a rape kit, *i.e.,* DNA analysis. She then gave a second statement at the police station, reiterating that two perpetrators were involved and that one of them placed his fingers in her vagina. When asked if she recalled any other participants in her home, she answered "No."

Subsequently, the relator was one of three men indicted[1] for sexual assault on the victim, despite the lack of any DNA evidence linking him to the crime[2] and the exculpatory evidence contained in the State's file. Upon conviction for aggravated rape, he received a sentence of life without the possibility of parole. In July 2001, this court affirmed his conviction and sentence. *State v. Ballard*, 99-3156 (La. App. 4 Cir. 7/25/01), 792 So. 2d 899, *writ denied*, 2001-2409 (La. 9/13/02), 824 So. 2d 1189.

Without financial resources or investigative assistance, the relator filed a timely, but unsuccessful, *pro se* application for post-conviction relief in August 2003.[3] *State v. Ballard*, 2004-0619, (La. App. 4 Cir. 5/28/04); *State ex. rel.*

---

[1] The three defendants (the relator, Ulysses Pierre, and Sidney Williams) were indicted in St. Bernard Parish for aggravated rape, a violation of La. Rev. Stat. 14:42. Mr. Williams' case was severed from his co-defendants and he was found guilty as charged. The relator and Mr. Pierre were tried together and found guilty as charged on July 21, 1999. The relator was sentenced to serve life in prison without the benefit of parole on July 30, 1999.

[2] The DNA evidence in this case establishes that both of the relator's co-defendants assaulted the victim.

[3] An application for post-conviction relief "allows for the presentation of claims that could not be addressed on direct review, including ineffective assistance of counsel, suppression of *Brady* evidence, juror misconduct, or any other cognizable ground that relies on evidence

2

*Ballard v. State*, 2004-1742 (La. 5/6/05), 901 So. 2d 1082. In 2013, he filed a second *pro se* application for post-conviction relief (again without financial resources or investigative assistance), including a claim that his counsel was ineffective on appeal for failing to raise the erroneous denial of his motion to suppress the photographic line-up. Again, the relator's *pro se* application was denied. *State v. Ballard*, 2013-1381 (La. App. 4 Cir. 10/15/13); *State ex. rel. Ballard v. State*, 2013-2675 (La. 7/31/14), 146 So. 3d 544.

In March 2017, the Innocence Project New Orleans (IPNO) accepted the relator as a client and filed the instant application on his behalf on March 17, 2017, with supplements filed in April 2018 and, again, in November 2018. In this counsel-filed application based on extensive investigation, the relator's claims are layered: (1) first, the State withheld exculpatory evidence in violation of *Brady*[4] but, in the alternative: (2) if the court finds that the evidence was not withheld, the court must consider whether defense trial counsel's failure to find and use the material constitutes ineffective assistance of counsel; if these constitutional claims fail, then the court must consider whether (3) the relator is entitled to relief based on his actual innocence and/or (4) in the interest of justice.

The relator's application is supported by substantial evidence and documentation, including supplemental police reports and other evidence known to the State but withheld from the relator, new accounts from witnesses, DNA results, expert reports, and numerous related affidavits. This includes the following pertinent documents:

---

outside the trial record." *State v. Harris*, 2018-1012, p. 8 (La. 7/9/20), __ So. 3d ___, 2020 WL 3867207.

[4] Pursuant to *Brady v. Maryland,* 373 U.S. 83 (1963), prosecutors maintain a continuing duty to disclose materially exculpatory evidence, *i.e.,* evidence favorable to the accused.

By sworn affidavit, the relator's trial attorney, Kerry Cuccia, states in relevant part:

1. He is a member of the Louisiana Bar in good standing with a practice in criminal and civil law.
2. In 1999, the relator's mother hired him to represent her son in this criminal matter. This was his first and, possibly, only trial in St. Bernard Parish.
3. He replaced the relator's appointed attorney, William Egan, a lawyer with St. Bernard Parish Indigent Defender Board and, as counsel of record, received the relator's file from Mr. Egan.
4. The relator's file contained only the initial report from the St. Bernard Parish Sheriff's Office, a return on a search warrant, an application for an arrest warrant, rights of the arrestee forms, the statements of the relator and his co-defendants, the crime scene technician's report, and a report from the Louisiana State Police lab.
5. Mr. Cuccia related, *"[b]ecause the above items were in the file and a discovery motion had been filed on Mr. Ballard's behalf by a previous attorney, I thought discovery had already been turned over by the State."* (emphasis added)
6. Upon being informed in 2017 by IPNO lawyers that many attorneys who practiced in St. Bernard Parish told them that DA Jack Rowley practiced open file discovery, Mr. Cuccia stated that, if true, he had never been aware of this policy.
7. Mr. Cuccia did not recall ever going himself or sending someone to the St. Bernard District Attorney's office to view or copy their files.
8. While representing the relator, Mr. Cuccia did not employ an investigator and did not hire one for this case; he did not consult with experts on eyewitness identifications, memory, or false confessions; he did not interview the relator's co-defendants; and he did not know that Ulysses Pierre recanted part of his confession implicating the relator or that Mr. Pierre refused to testify against the relator.
9. Mr. Cuccia did not know why the entire rape kit was not tested but conceded he did not seek out additional DNA testing or consult with an expert on DNA or forensic DNA testing.
10. When shown a number of documents in 2017 by IPNO attorneys, including statements by witnesses (Louis Caesar, Yolanda Caesar, and `Quandreka Ballard), the victim's first and second written statements, Criminal Investigation Bureau reports regarding witness interviews, the Final Supplemental Report, or the application for the search warrant for 2402 Licciardi Lane, Mr. Cuccia observed that, had he been aware of this information, he would have used the relevant exculpatory material for impeachment purposes. Further, Mr. Cuccia enumerates specific

portions of the witness statements that could have been used for impeachment purposes.

11. Mr. Cuccia stated that he had never talked to the relator's aunt, Dale Pierre, and neither knew or had ever talked to Sabrika Lewis or Tyrus Duplessis about the relator's case.

By sworn affidavit, William Egan (the attorney appointed initially to represent the relator) corroborates Mr. Cuccia's statement. He states that he turned over to Mr. Cuccia all the discovery material provided by the State pertaining to the relator prior to trial. As a matter of routine, because the D.A.'s office offered open file discovery, Mr. Egan or his assistant regularly went to the prosecutor's office to make copies of his clients' files. He recalls personally copying and delivering all of the documents he obtained from the relator's file to Mr. Cuccia when Mr. Cuccia enrolled as counsel.

In addition, the application includes copies of both the initial police report that the relator's pre-trial counsel (Mr. Egan) obtained from State in response to his discovery request and transferred to the relator's trial counsel (Mr. Cuccia) in the relator's file, as well as the supplemental police report that was later discovered to be in the State's possession but never proffered to trial counsel.

*The Initial Police Report*

The narrative in the initial report that Mr. Cuccia received reveals scant information beyond the victim's complaint that two men entered her house and raped her. Specifically, the narrative relates:

> Upon opening the door, she observed two black males, one dressed in a red pullover shirt with a hood, the other wearing a dark colored parker style jacket with a hood." One of the men spoke, but the victim could not understand him so she told them they had the wrong house and started to close the door. One of the perpetrators pushed the door open and shoved her backward; then she began to flee toward the bedroom where her grandson was sleeping. The perpetrators followed her and then one of them grabbed her by the neck and forced her onto

the bed. While one of the men ransacked the residence, the other tied her hands, unsnapped the crotch of her pants, and raped her vaginally. The second assailant approached her with a pillow and threatened to smother her if she did not tell him where she kept her valuables. The second assailant then turned the victim over and raped her anally while simultaneously placing his fingers inside her vagina. The two men repeatedly questioned her about the location of a safe. When the victim explained that the ring on her finger was her only valuable possession, one of the men removed it, lacerating her finger in the process. The assailants placed a pillowcase over the victim's head and threatened to kill her unless she revealed the location of the safe. The men eventually left the residence taking several electronic items with them. The victim told police that she had never seen the perpetrators before the attack.

Notably, there is no reference to the statements of the victim's grandson or neighbors, statements consistent with the victim's initial statement that there were only two perpetrators.

*The Supplemental Police Report*

In contrast to the limited narrative of the police report found in trial counsel's file, the supplemental police report in the State's file (discovered by IPNO more than a decade later through a public records request) includes statements and "gists" of interviews given by witnesses, both co-defendants, and the victim.[5] Included in the supplemental report, authored by Detective Ray Whitfield, is the "Narrative Sheet" describing the investigation wherein Detective

---

[5] The relator explains in his application and supplement to this court that, in response to his request for assistance, the IPNO obtained what purported to be the State's file of defendant in 2015 (prior to enrolling as defense counsel) through a public records request to the St. Bernard Sheriff's Office. Included in that file was the complete supplemental police report. The Innocence Project also obtained the contents of the relator's trial file that was in the possession of his trial attorney, Mr. Cuccia, who had, in turn, received the file from the relator's pre-trial counsel, Mr. Egan. The relator reiterates that the file obtained from Mr. Cuccia did not contain the supplemental police report, the search warrant documents, or any of the interviews or statements set forth above. The relator also states that the file obtained from the St. Bernard Sheriff's Office via the public records request appears to be a "recreation" of the district attorney's file because it does not include any pre-trial pleadings and is marked with a "Record Room Only" stamp rather than the "D.A. Copy" stamp that appeared on the documents received directly from the relator's trial attorneys. Based on this, the relator submits that the State did not provide his trial attorneys with all the exculpatory material in its possession.

6

Whitfield reports that the victim's neighbor, Yolanda Caesar, made the first call to 911 to report the burglary of her neighbor and, shortly thereafter, the victim called the police and reported the attack. It also includes the fact that the police took a statement from the victim's grandson who reported seeing only two men.

Detective Whitfield's narrative also includes the following information: Deputy Kenneth Letort arrived at the scene carrying a red hooded sweatshirt that he had taken nearby from a black male who fled from an attempted interview.[6] After the victim identified the red sweatshirt as the one worn by one of the perpetrators, she was taken to the hospital for a sexual assault (a/k/a "rape kit") examination. Upon release from the hospital, the victim went to the police station and gave another (and corroborating) statement. Again, she reported only two perpetrators, specifically stating that the man who anally penetrated her simultaneously placed his fingers inside her vagina.[7] When asked if she recalled any other participants inside her residence, she replied, "No."

The supplemental report narrative also includes a gist of Louis Caesar's initial statement to police describing two intruders breaking into the victim's home. Mr. Caesar recognized Mr. Pierre as the individual taking items from the victim's residence and placing them into the vehicle, but could not identify the second perpetrator.

In addition, the supplemental report indicates that Mr. Pierre was arrested at 10:00 am on January 10, 1998, and that the search warrant for Licciardi Lane was

---

[6] Elsewhere in the narrative sheet is a "gist" of an interview conducted with Deputy Letort, in which he stated that the man who fled had identified himself as Damian Green, although Deputy Letort later learned the suspect was named Ulysses Pierre after identifying him in a photograph.
[7] At trial, the victim attributed these two acts to two different perpetrators. Accordingly, this is exculpatory material that could have been used for impeachment purposes.

7

prepared based on information provided by Mr. Pierre. Notably, neither the warrant nor affidavit contains any reference to the relator.

In addition, the supplemental report contains the statement Ms. Quandreka Ballard gave to Sergeant McNab on January 10, 1998 at 2:15 pm:

> Sidney Williams made me sit in the car and knocked on the neighbor's door. Then they went to the lady's house but I couldn't see them anymore. Ulysses kept coming to the car with property. Sidney had on gloves but Ulysses didn't have any gloves on. I was crying because I knew they were stealing the stuff and I told Sidney to bring me home but he wouldn't. Then Ulysses told me he raped the lady and Sidney also told me Ulysses raped her. Sidney told me he didn't rape her but Ulysses told me he tied her up and raped her. Then we went by Tracy Richards' house and Ulysses brought everything in the shed. Sidney gave me a ring and when I went home I threw it outside in the grass and when the police came over I gave it to them.

In response to further questioning, Ms. Ballard stated that Mr. Williams drove a vehicle belonging to Farrel Anderson, though she did not think Mr. Anderson was aware of the incident. Ms. Ballard asserted that she entered the vehicle at the Webbers Hotel on Chef Menteur Hwy and they picked up Mr. Pierre on Licciardi Lane before driving to the victim's residence. The whole incident lasted between thirty minutes to an hour and she returned home at 3:15 am. She further stated that Mr. Pierre was her cousin and Mr. Williams was her boyfriend.

The supplemental report includes the "gist" of an interview of Sidney Williams, taken at 11:45 pm on January 10, 1998.[8] Mr. Williams made the following statement:

---

[8] The relator does not claim that the State withheld Mr. Williams's statement, but it is included in the supplemental report. Notably, at trial, the relator called Mr. Williams to testify on his behalf and Mr. Williams declined, invoking his Fifth Amendment right to remain silent. Both the prosecutor and Mr. Williams's attorney suggested to the court that in exchange for a favorable plea deal, Mr. Williams would be willing to testify that defendant was present and participated in the attack, although no final plea agreement existed at that time.

8

> We heard that there was supposed to be a safe in the house, we went there just to go burglarize it. We knocked on the door and a lady answered it. Noon pushed the door open and grabbed the lady. I went into the house, I told the lady no one is going to hurt you, just tell us where the safe is. Noon brought her to the room the safe was supposed to be in the closet. And um, he got her in the room, I started digging in the closet and I didn't find it. So, I went into the next room and told Noon to stay in the room and not to let her use the phone. I started searching the rest of the house, I didn't find the safe, and I started taking the TV, radio, and jewelry. The whole while Noon was in the room with the lady. I went in there and seen him fucking her from behind. I asked him don't hurt that lady, I said, "Man, I'm leaving." I put the TV in the car and started the engine. I pulled the car up a little in the driveway and hit the horn. I hit it twice, he came to the front door and said, "Hold up, hold up." I got out and closed the back door. Noon came running out the house about a minute later.
>
> After that, I went up to Highland and told him to take everything out of the car. So we had it parked for about ten or fifteen minutes. Noon took everything out of the car, then I went to Garden Street and Benton, or something like that. And I knew Farrel was mad at me cause I didn't make it back when I was supposed to. I didn't have any money to come back down in the parish with the car so I stayed up there and caught a ride back here. When I got home everyone was telling me that the police were looking for me for rape. I got in touch with my momma cause they had me wrong; I didn't touch the lady. So I turned myself in to the jail with my momma.

When questioned, Mr. Williams identified Mr. Pierre as the other perpetrator. He related further that Ms. Ballard was waiting in the car, although she was not aware of the plan until she observed the men putting the victim's property in the vehicle. When asked what role the relator played in the attack, Mr. Williams replied, "He wasn't even there." At the conclusion of the interview (when asked if he wanted to include any other information), Mr. Williams declared, "Only that Jarvis wasn't there and that Noon was the only one to rape that lady."

The supplemental police report also contains a subsequent statement by the victim taken on January 28, 1998, at 7:38 pm, wherein she told the police that the perpetrators placed her in the closet, but when she heard her grandson cry out, she ran to comfort him. She stated that she had also recently learned that she had contracted an STD.[9] When asked whether "she believed it to be possible that three subjects were inside her residence that night at the time of the assault," the victim responded, "Yes, it's entirely possible, I was face down on the bed during most of the sexual assault, and one of them kept leaving the room and coming back into the room." The full interview, contained elsewhere in the supplemental report, reveals that the question specifically asked of the victim was, "We have arrested three subjects in connection with the rape and burglary, you were able to identify two of the subjects; do you feel that there could have been three assailants inside your residence at the time of the attack?"

*Exculpatory Evidence Discovered by IPNO Investigation*

In addition to the evidence found in the State's file, the relator submits substantial documentation of relevant evidence gathered by IPNO investigators and attorneys that supports the relator's application for post-conviction relief, including the following pertinent documents:

(1) In an affidavit executed by his co-defendant, Ulysses Pierre, on November 6, 2017, Mr. Pierre admits that his statement to police that the relator was involved was, in fact, false. Mr. Pierre explained that the

---

[9] The State bases its claim that the relator's attorney was "absolutely" provided with the supplemental report and had full disclosure of the State's file based on a motion filed on the relator's behalf referencing the victim's STD. According to the State, there is no other way defense counsel could have discovered this information, discounting the possibilities of this knowledge being related by another person with knowledge of the file and, in essence, accusing Mr. Cuccia, a member of the Louisiana Bar in good standing, of lying in his sworn statement when he says he did not have access to or knowledge of the supplemental report or other documents in the State's file until he was provided with copies by IPNO in 2017.

relator's sister, Quandreka Ballard, lived with his family on and off growing up, so he felt protective of her. At the time of the incident, Quandreka Ballard was a teenager, but she was dating Sidney Williams, nicknamed "Bird," who was older than Mr. Pierre. He admitted that he abused drugs and alcohol and was "not in a good place mentally" in his youth. Mr. Pierre recounted the events on the night of the attack as follows:

> On the night of the crime, I was high and hanging out on the corner in my neighborhood. As I was on the corner, Bird drove up in a car and pulled over. Quandreka was in the passenger seat of the car. When they pulled up, I could see that Bird was loaded. I was worried about Quandreka, so I got in the car. Once I got in the car, Bird told me about a hustle we could pull. In other words, Bird told me about a burglary that he wanted me to help him commit. I agreed. Bird pulled up in front of a house. Bird and I went to the door of a house. An older white lady answered the door. Bird and I pushed into the woman's house. When Bird and I went into the lady's house, Quandreka stayed in the car. We went to the lady's bedroom. Bird told me to hold her so I grabbed her. Bird was going through the lady's stuff.
>
> At some point when we were in the bedroom, Bird told me, "Just fuck her." I can't forgive myself for what I did next. She was face down on the bed, I tried to rape her from behind, but it wasn't working, so I turned her face up and raped her. At some point when we were in her bedroom, Bird told me to tie the lady up. I used a cord to tie her hands together. I grabbed a stereo or television and put it in the trunk of the car. Later, Bird left the house and got back in the car. Bird got in the driver's seat. Quandreka was still in the car.
>
> After we drove away from the lady's house, Bird stopped and we put the stuff we took from the house in a shed behind Tracey's house. I didn't really know Tracey, I just knew her as someone from the neighborhood. Later on I was riding a bike in the neighborhood and the police stopped me. I know someone named Damion Green I may have told the police that was my name. I ran away before I could be arrested. Later that morning, I was arrested.

When the police questioned me about the crime, I was ready to just take my charge and get on with it. I felt terrible about what had happened and I was willing to do my time for what I did. I told the officers I committed the crime, but I lied and told them it was me alone. They hit me and threatened me, so I lied and told the police Jarvis Ballard was there even though he wasn't involved. When the police were questioning me, I just panicked. I thought if Jarvis was picked up, they couldn't do anything to him because he wasn't guilty. After that, I never again told anyone that Jarvis was there. I never told my attorney that Jarvis was there. I never told him I would testify that he was involved. My mom asked me if I would testify and say that Jarvis was there. I told her no.

I heard later that Jarvis signed a statement. I am still confused about how he was able to tell the police anything about the crime since he wasn't there. I don't understand why he told the police he was there when he wasn't. I didn't tell the police that Quandreka Ballard was in the car—she never went in the house, I felt like she wasn't really involved.

Before we went to trial, Jarvis, Bird and I were offered a plea deal—it was a package deal, we all had to agree to take it. Bird and I wanted to take the deal and get it over with. Jarvis refused to take the deal which meant we couldn't take it either. I'm still mad that Jarvis didn't take the deal, he ruined that for us. Until Charell Arnold from Innocence Project New Orleans came and visited me at Angola in April 2017, no attorney or any other representative for Jarvis Ballard ever met with me or tried to meet with me.

(2) By affidavit provided to an IPNO attorney, Ms. Dale Pierre, Ulysses Pierre's mother and the relator's aunt, states that the prosecutor had offered the three co-defendants a plea bargain whereby all three would have to plead guilty.[10] According to Ms. Pierre, the relator was the only

---

[10] The relator also claims that the State withheld earlier oral statement made by co-defendant, Ulysses Pierre, in the presence of Mr. Pierre's mother and the prosecutor, in which Mr. Pierre recanted his initial statement to police, and stated that defendant, Jarvis Ballard, was not present the night of the attack and was, in fact, innocent. The relator asserts that these statements were material as they indicated that only two men participated in the attack, and those men were Ulysses Pierre and Sidney Williams, while Quandreka Ballard waited in the vehicle outside the victim's residence.

one who would not agree, as he maintained his innocence, so the prosecutor asked Ms. Pierre to convince defendant to take the plea.[11]

(3) The relator also submits the affidavit of Sabrika Lewis, who states that she saw the relator at a high school party several hours before the attack occurred. Tyrus Duplesses also provided an affidavit stating that he saw the relator in jail after his arrest, relating that the relator was doubled over in pain and claiming that the police had beat him and forced him to sign a statement that was untrue. According to Mr. Duplesses, the relator told him that he did not understand why Ulysses Pierre had given his name to the police as he was not involved.

*The State's Response to the Relator's Application for Post-Conviction Relief*

In response to the relator's application, the State argues that the relator's claims are procedurally barred from consideration because none of the exceptions provided in La. Code Crim. Proc. art. 930.8(A) are applicable. In other words, the State insists that, regardless of merit or the interests of justice, the relator's claims may not be considered.

*Actions of the District Court*

Despite the substantial documentation gathered as a result of IPNO's investigation and submitted in support of the relator's application for post-conviction relief, the district court did not hold an evidentiary hearing in this matter. Rather, after only a status hearing, the district court summarily denied the relator's application. Moreover, in its Reasons for Judgment, the district court addressed only the claims acknowledged by the State in its written opposition. The

---

[11] Ms. Pierre also explained in her affidavit that the defendant was younger than Ulysses Pierre; thus, it was unlikely that the defendant would have issued orders to Mr. Pierre (as the victim alleged at trial) to rape the victim.

district court ordered an evidentiary hearing on the relator's claim that an alternate juror participated in jury deliberations but, as to the relator's other claims, ignored those not addressed by the State and adopted the State's conclusory language to summarily dismiss the claims addressed by the State. Specifically, the district court stated:

> The state identifies nine "Newly Discovered Evidence" claims made by [defendant] in his Application for Post-Conviction Relief; (1) Supplemental Police Report and Voluntary Statements, (2) New DNA Results, (3) Exculpatory Conversation Between Co-defendant and ADA, (4) Co-defendant's Statement, (5) Witness to Petitioner's Injuries, (6) Secretary Conflict, (7) Witness on Night of Crime, (8) Juror Deliberations, and (9) Open File Discovery.
>
> The Court finds that Mr. Ballard's claim that the supplemental police report and voluntary statements were withheld by the State is without merit. After an extensive review of the record, the Court finds that these items were readily available to Mr. Ballard and/or his previous counsel and are not newly discovered evidence under Louisiana law that would entitle him to an exception to the time limitation in La. C.Cr.P. Art. 930.8.
>
> The Court finds that Mr. Ballard's claim that new DNA testing of previously untested items excludes his participation in the crime is without merit. After an extensive review of the record, there is no allegation that Mr. Ballard's DNA was found in the relation to this crime. This is not newly discovered evidence under Louisiana law that would entitle him to an exception to the time limitation in La. C.Cr.P. Art. 930.8.
>
> The Court finds that Mr. Ballard's claim in regards to a conversation between Co-Defendant, Ulysses Pierre, and an Assistant District Attorney that was overheard by his Co-Defendant's mother, Dale Pierre, wherein Ulysses Pierre allegedly stated that Mr. Ballard was not involved in the crime is without merit. This issue was addressed at trial. This is not consistent with the testimony at trial and is not newly discovered evidence under Louisiana law that would entitle him to an exception to the time limitation in La. C.Cr.P. Art. 930.8.

The Court finds that Mr. Ballard's claim that Co-Defendant, Ulysses Pierre, now states that Mr. Ballard was not involved in the crime is without merit. This issue was addressed at trial. This is not consistent with the testimony at trial and is not newly discovered evidence under Louisiana law that would entitle him to an exception to the time limitation in La. C.Cr.P. Art. 930.8.

The Court finds that Mr. Ballard's claim regarding a witness who saw Mr. Ballard injured after his interrogation is without merit. This issue was addressed at trial. This is not newly discovered evidence under Louisiana law that would entitle him to an exception to the time limitation in La. C.Cr.P. Art. 930.8.

The Court finds that Mr. Ballard's claim regarding the alleged conflict of interest with Secretary, Jennifer Ingargiolia, is without merit.[12] The record is clear that there is no conflict of interest. This is not newly discovered evidence under Louisiana law that would entitle him to an exception to the time limitation in La. C.Cr.P. Art. 930.8.

The Court finds that Mr. Ballard's claim regarding witnesses to his where-abouts on the night of the crime is without merit. This issue was addressed at trial. This is not consistent with the testimony at trial and is not newly discovered evidence under Louisiana law that would entitle him to an exception to the time limitation in La. C.Cr.P. Art. 930.8.

The Court finds that Mr. Ballard's claim regarding jurors' misunderstanding that they could issue separate verdicts for Mr. Ballard and his Co-Defendant is without merit. After an extensive review of the record, the Court finds that the jury was properly informed of their ability to issue separate verdicts for the Defendants. See *State's Opposition Exhibit 36, Trial Transcript - Page 60.* This is not newly discovered evidence under Louisiana law that would entitle him to an exception to the time limitation in La. C.Cr.P. Art. 930.8.

After an extensive review of the record, the Court finds that it is unclear whether Mr. Ballard's Application for

---

[12] This finding relates to the relator's claim that his pre-trial Indigent Defender Board (IDB) attorney employed a legal secretary who simultaneously worked as the legal secretary in the D.A's Office. In his Reply to the State's Opposition, the relator expressly withdrew this claim.

Post-Conviction Relief and supporting documentation sufficiently demonstrate that the facts upon which his claim that an alternate juror participated in jury deliberations is predicated were not known to Mr. Ballard or his attorney such that the exception to the time limitation in La. C.Cr.P. Art. 930.8 would apply. Therefore, the Court orders an evidentiary hearing to determine the merits of this claim.

The Court finds that Mr. Ballard's claim that the jury never heard important documents because the District Attorney's Office practiced open file discovery is without merit.[13] After an extensive review of the record, the Court finds that these items were readily available to Mr. Ballard and/or his previous counsel and are not newly discovered evidence under Louisiana law that would entitle him to an exception to the time limitation in La. C.Cr.P. Art. 930.8.

The final procedural objection made by the State of Louisiana is that Mr. Ballard has filed repetitive and successive applications for post-conviction relief. The State avers that Mr. Ballard inexcusably omitted the allegations regarding the supplemental police report, along with other documents. Additionally, the State contends that Mr. Ballard has raised an ineffective assistance of counsel claim in his direct appeal of the conviction and his Second Application for Post-Conviction Relief.

After an extensive review of the record and in applying La. C.Cr.P.Art. 930.4, the Court finds that Mr. Ballard's Application for Post-Conviction Relief contains successive and repetitive allegations. The record is clear that Mr. Ballard has alleged a claim for ineffective assistance of counsel twice previously. Additionally, the record shows that the supplemental police report and other documents were available to Mr. Ballard and/or his prior counsel. This allegation, though new, was inexcusably omitted from his previous applications. For these reasons and pursuant to La. C.Cr.P. Art. 930.4, these allegations in Mr. Ballard's Application for Post-Conviction Relief are dismissed.

The relator timely filed this application for supervisory review.

---

[13] The relator never argued that open file discovery was a newly discovered fact that would qualify as an exception to the time limitation; rather, he argues correctly that open file discovery did not discharge the state's affirmative *Brady* obligation.

*Discussion*

The issue before the district court was whether the relator's claims for post-conviction relief are procedurally barred from consideration. The relator concedes that the instant application was not filed within two years of the date that his conviction and sentence became final, asserting instead that the exceptions provided for in Article 930.8 are applicable.

La. Code Crim. Proc. art. 930.8(A) provides in pertinent part:

> A. No application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of Article 914 or 922, unless any of the following apply:
>
>> (1) *The application alleges, and the petitioner proves or the state admits, that the facts upon which the claim is predicated were not known to the petitioner or his prior attorneys.* Further, the petitioner shall prove that he exercised diligence in attempting to discover any post-conviction claims that may exist. "Diligence" for the purposes of this Article is a *subjective inquiry* that must take into account the *circumstances of the petitioner*. Those circumstances shall *include but are not limited to the educational background of the petitioner, the petitioner's access to formally trained inmate counsel, the financial resources of the petitioner, the age of the petitioner, the mental abilities of the petitioner, or whether the interests of justice will be served by the consideration of new evidence.* New facts discovered pursuant to this exception shall be submitted to the court within two years of discovery. (emphasis added)

*Analysis*

The relator's primary claim is that the State withheld exculpatory evidence in violation of *Brady.* Specifically, the relator points out that despite filing the

customary pre-trial discovery motion and the State's ongoing *Brady* obligation, the

relator's trial counsel only received the initial police report and remained unaware

of statements and other evidence in the State's file highly indicative of the fact

there were only two perpetrators (Williams and Pierre) involved in this crime. In

the alternative, the relator argues that if there was no *Brady* violation (and the

relator's attorneys knew or should have known of the exculpatory evidence), then

the court must determine if the failure to use the exculpatory evidence for

impeachment and other purposes constitutes ineffective assistance of counsel.[14]

The relator also points out that "new" DNA evidence excluding him as a

contributor of genetic material in the victim's rape, as well as a polygraph

examination and witness statements firmly indicate his actual innocence.[15] Finally,

the relator asserts that if consideration of his claims are barred for other reasons,

the court should consider (as Article 930.8 provides) his claims in the interest of

justice.

In the first paragraph of its Reasons for Judgment, the district court clearly

indicates that it only considered those claims acknowledged and addressed by the

State in its written opposition and, moreover, only as the claims were characterized

by the State, not as they were raised by the relator. This was clear error. A district

court must independently consider all of the relator's claims for post-conviction

---

[14] In other words, where the relator asserts that State withheld exculpatory evidence in violation of *Brady* and the district court finds that the exculpatory evidence was, in fact, available to the relator's attorneys, then the alternative claim must be considered: does the failure to use the exculpatory evidence for impeachment or other purposes constitute ineffective assistance of counsel?

[15] The grounds for post-conviction relief include state or federal constitutional violations underlying the petitioner's conviction, as well as clear and convincing proof from DNA testing that the petitioner is factually innocent of the crime for which he has been convicted. La. Code Crim. Proc. art. 930.3 (1) & (7).

relief, not just those the State chooses to discuss or in the terms defined by the State.

In addition, the State's opposition to the relator's application was based on the ground that it was procedurally barred. Therefore, the defined issue before the district court at this stage of the proceeding was whether the relator was entitled to his proverbial day in court, not whether he will ultimately win or lose on the merits. *See State v. Toca,* 2010-1451, pp. 3-4 (La. App. 4 Cir. 4/12/11) (unpub'd) (when the State asserts, in response to an application for PCR, only that the relator's claims are procedurally barred, the substance of those claims are not at issue). Nonetheless, throughout the remaining paragraphs of its Reasons for Judgment, the district court repeatedly intertwines findings on the merits of the relator's specific claims with its conclusions that the Article 930.8 exceptions were not applicable (and therefore the claims were procedurally barred), all without discussion of the evidence supporting the claim or the facts upon which the conclusions were based. Thus, to avoid confusion upon remand, the district court's reasoning in each of the paragraphs of its Reasons for Judgment is addressed with particular specificity.

In the second paragraph of its Reasons for Judgment, the district court concluded in generic terms that the relator's *Brady* claim (a serious constitutional violation) was without merit and, also, that the facts underlying the claim were not newly discovered pursuant to Article 930.8. Neither conclusion is supported by the record before us. Specifically, the sworn affidavits of Mr. Cuccia and Mr. Egan attest to the absence of the supplemental police report and voluntary statements in the discovery material conveyed by the State. In response, the State

19

submits no contrary evidence, offering only convoluted argument[16] and conjecture.[17] The State's contention that relator's trial attorneys possessed the supplemental report because it was contained in the LSU Law Library's file only proves that the LSU Law Library possessed the supplemental police report at the time it was turned over to the Innocence Project.[18] The LSU Law Library file cover sheet, attached as exhibit M, indicates that the file it turned over to the Innocence Project was not actually the relator's trial records, but instead, the records from the appeal of all three co-defendants, including Mr. Williams, who was tried separately. Thus, the records included in the LSU Law Library file may include documents or evidence introduced in Mr. Williams's trial that were not included in defendant's trial records.

With regard to the State's assertion that Mr. Cuccia "absolutely" had access to the supplemental police report because in his cross-examination of the victim at trial Mr. Cuccia asked the victim if she had made an earlier statement that only two

---

[16] The  State asserts that there is no other way defense counsel could have discovered this information, discounting the possibilities of this knowledge being related by another person with knowledge of the file and, in essence, accusing Mr. Cuccia (a member of the Louisiana Bar in good standing) of lying in his sworn statement that he did not have access to or knowledge of the supplemental report or other documents in the State's file until he was provided with copies by IPNO in 2017 and, similarly, impugning the honesty of Mr. Egan.

[17] With regard to the State's insistence that the pre-trial motion for DNA testing filed by Mr. Egan referenced "information taken from the reporting officer's narrative indicates that the victim contracted gonorrhea as a result of the rape" proves that Mr. Egan was in possession of the supplemental report, the relator submits a second affidavit executed by Mr. Egan wherein which he states that he did not recall the source of his knowledge of the victim's STD contraction and that he may have heard the information from the prosecutor, an investigating police officer, one of the co-defendant's attorneys, or the supervisor of the Indigent Defender Board. He also relates that his regular practice was to attach any supporting documents to his motions and, therefore, the absence of the supplemental report as supporting his claim to his motion filed at the time, suggesting that he was not, in fact, in possession of the supplemental report.

[18] The relator submits also an affidavit executed by Jack Largess, an investigator for the Innocence Project, stating that the only material he was able to obtain relating to the relator's trial was the appellate record in possession of the LSU Law Library. He explained that he attempted to procure the file from this court, but was told that the 1999 record would have been returned to the LSU Law Library. He stated that he also reviewed the Supreme Court's file, including writ applications, and none of the other files he reviewed contained the supplemental report discussed above.

men had raped her, the State presents no evidence to support its hyperbolic certainty. As noted by Mr. Cuccia in his affidavit, he possessed the initial police report that included the brief statement that "two B/M's (one wearing a red pullover shirt with a hood and the other subject wearing a dark colored parker style jacket with a hood) forced their way into the residence." The initial police report also included the victim's statement that one subject raped her anally while the other ransacked the residence, then they "changed up" and the other subject began raping the victim. Based on this statement, Mr. Cuccia attempted to impeach the victim at trial. The State objected, admitting that the initial police report was incomplete. The colloquy occurred as follows:

> **DEFENSE:** Now, Ms. [D], have you ever given a statement contrary to what you said today, specifically that it was only two men that came into your house?
>
> **VICTIM:** My original written testimony says I identified two men.
>
> **DEFENSE:** Well, the two men, they are the two men that came into your house?
>
> **VICTIM:** Well, what I said was I saw two. I saw two at a time. I didn't see three at a time.
>
> **DEFENSE:** You remember telling the officers that the man in the—there was a man in a red pullover shirt with a hood and another subject wearing a dark colored parker with a hood?
>
> **VICTIM:** Yes.
>
> **DEFENSE:** And you told the officers that it was the man in the red shirt with the hood who forced you into the bedroom and told you to lie on your back and then began to tie your hands behind your back?
>
> **VICTIM:** I don't think I said what he was wearing.
>
> **DEFENSE:** I am sorry?

21

**VICTIM:** I can't remember if I said he was wearing a red pullover shirt. I said there was some red in the jacket.

**DEFENSE:** It was the man with the red on the jacket that you remember telling you, forced you into the bedroom?

**VICTIM:** I didn't say forced me into the bedroom. I said I went in with one in front of me and one behind me. And the one had the red on his jacket raped me first.

**DEFENSE:** I am going to show you what I have marked as Defendant Exhibit 1 and ask you to review the portion down here. Review the whole thing. But I direct your attention to the portion down here which appears to be a narrative.

**THE STATE:** Excuse me. This purports to be the police report from the St. Bernard Parish Sherriff's Office, not written by [the victim] or signed by [the victim]. I don't know how that could form the basis for impeachment.

**THE COURT:** Let her look at it. Go ahead and look at it.

**VICTIM:** I was not aware that they were taking my statement and writing this down. This was right after the incident and they were taking my blood pressure. I was about to leave for the hospital. It is not my written statement that I gave to the police.

**DEFENSE:** I understand it is not the same as the written statement you later gave to the police, but it is an accurate depiction of what you told the officers at the scene?

**VICTIM:** It is a very abbreviated version.

**DEFENSE:** That's the first time you reported it to anyone, when you were telling the officers there at the scene?

**VICTIM:** Yes.

**DEFENSE:** I want to go over it with you, or let me ask you, you have not had a chance to review it?

**VICTIM:** No.

**DEFENSE:** Would you take as long as you need and let me know when you are ready?

**VICTIM:** Well the details are pretty much—it says here sometime during the rape one of the subjects put a pillowcase over my head, which is not the case.

**DEFENSE:** Let me ask you, have you had a chance to review it?

**VICTIM:** Yes.

**DEFENSE:** Let me ask you a few questions.

**THE STATE:** Excuse me. He was attempting to cross-examine on a report she did not make, did not write, and it is not the complete report.

**DEFENSE:** *First of all, it is the entire incident report that was produced to us by the district attorney's office.* So it is complete in and of itself. I made a request for the arrest report and I was told I can't have it. Now, to complain I don't have the entirety, it is ludicrous. But be that as it may—

**THE STATE:** You said you don't have it, then you produce it.

**DEFENSE:** You say this is not the whole thing. This is what I have.

If anything, this colloquoy supports Mr. Cuccia's declaration that he only had access to the initial police report at the time of trial. While it is axiomatic that it is within the discretion of the district court, faced with contradictory testimony, to make a credibility determination and that such a ruling will not be disturbed absent clearly contrary evidence, there has been no evidentiary hearing or live testimony in this matter upon which the district court may base a credibility determination. The State submits no colorable evidence contrary to the sworn statements of Mr. Egan and Mr. Cuccia, and its arguments in response to the

attorney statements are neither evidence nor persuasive.[19]  Under these

circumstances, it is unclear why the district court determined the "newly

discovered evidence" exception did not apply to the relator's *Brady* claim.  There

is no evidence in the record before us that the relator or his attorneys had actual

knowledge of the facts contained in the supplemental report or in the recently-

executed affidavits submitted in support of the relator's application.  *See State ex.*

*rel. Winn v. State*, 95-0898 (La. 10/2/96), 685 So.2d 104 (the relator's *Brady* claim

rested "on facts not known to him or his attorneys and which did not become

known to him until he obtained documents pursuant to the Public Records Act"

and therefore fell under the exception to the time limitation provided under La.

Code Crim. Proc. art. 903.8(A)(1) for filing a post-conviction relief application).

In the third paragraph of its Reasons for Judgment, the district court

summarily dismissed the relator's claims based on newly tested DNA evidence as

procedurally barred and, again, gratuitously found the claims to be without merit.

However, according to the relator's supplement to his post-conviction relief

application filed on April 27, 2018, the State and the relator "agreed to DNA

testing, and on June 27, 2017, testing was ordered by this court." Pursuant to La.

---

[19] The State also asserts that the relator's appellate counsel was in possession of the supplemental report prior to 2015 because Sidney Williams entered it into evidence in his separate trial and the relator collectively appealed with his co-defendant and Mr. Williams.  This argument fails to acknowledge that the relator's trial attorneys were not in possession of the supplemental report, which appellate counsel would have had no reason to know, nor would she have necessarily conducted any investigation outside of the appellate record when preparing her brief. Importantly, the relator's *Brady* claim does not solely rest on the alleged withheld evidence, but it also includes evidence in the form of affidavits that neither of the relator's trial attorneys were aware of the information contained in the supplemental report. It was not until the Innocence Project received the file from the St. Bernard Parish Sheriff's Office and compared it to the file Mr. Cuccia possessed during trial, that evidence of the instant *Brady* claim became "known." The State also asserts that the Innocence Project New York (IPNY) submitted a Public Records request for defendant's trial record in 2010, but never came to copy or inspect the file. However, IPNY never enrolled as the relator's counsel and, as discussed above, IPNO did not enroll as counsel for the relator until 2017,

Code Crim. Proc. art. 926.1,[20] the State could have raised any objection prior to agreeing to new DNA testing, and the district court could have denied the additional testing if it found the application untimely, or unnecessary. Because the State failed to raise any objection to the relator's application for new DNA testing, and the district court found no reason to deny the application at the time it was filed, the relator should not now be barred from the introduction of the DNA testing to demonstrate his innocence claim based on a new objection by the State.[21]

---

[20] La. Code Crim. Proc. art. 926.1 provides in pertinent part:

> B. An application filed under the provisions of this Article shall comply with the provisions of Article 926 and shall allege all of the following:
>> (1) A factual explanation of why there is an articulable doubt, based on competent evidence whether or not introduced at trial, as to the guilt of the petitioner in that DNA testing will resolve the doubt and establish the innocence of the petitioner.
>> (2) The factual circumstances establishing the timeliness of the application.
>> (3) The identification of the particular evidence for which DNA testing is sought.
>> (4) That the applicant is factually innocent of the crime for which he was convicted, in the form of an affidavit signed by the petitioner under penalty of perjury.
> C. In addition to any other reason established by legislation or jurisprudence, and whether based on the petition and answer or after contradictory hearing, the court shall dismiss any application filed pursuant to this Article unless it finds all of the following:
>> (1) There is an articulable doubt based on competent evidence, whether or not introduced at trial, as to the guilt of the petitioner and there is a reasonable likelihood that the requested DNA testing will resolve the doubt and establish the innocence of the petitioner. In making this finding the court shall evaluate and consider the evidentiary importance of the DNA sample to be tested.
>> (2) The application has been timely filed.
>> (3) The evidence to be tested is available and in a condition that would permit DNA testing.
> D. Relief under this Article shall not be granted when the court finds that there is a substantial question as to the integrity of the evidence to be tested.
> E. Relief under this Article shall not be granted solely because there is evidence currently available for DNA testing but the testing was not available or was not done at the time of the conviction.

[21] "[T]he DNA testing article is not another form of motion for new trial, based on new evidence (the DNA) which will serve to call the state's case into question, and perhaps warrant a re-trial." *State v. Edwards*, 43,802, p. 2 (La. App. 2 Cir. 8/7/08), 988 So.2d 850, 852. Accordingly, "the standard applied to the threshold question of DNA testing itself is whether the test results will establish the innocence of the petitioner by clear and convincing evidence." *Id.* Clearly, the time

25

In light of the State's acknowledgement at trial that the relator's DNA was not discovered on the items it chose to have tested (inexplicably failing to include all the swabs taken from the rape kit), it was error for the district court to find that the new DNA test results are now procedurally barred from consideration in relation to the relator's claims of actual innocence.

Further, we observe that the State presented no procedural objection to the polygraph examination administered on October 16, 2018, and the district court did not reject that evidence on procedural grounds. The polygraph results indicate that defendant was truthful when he denied that he was physically present during the attack, when he denied participating in the attack, and when he denied that he had ever been inside the victim's residence. Although polygraph examinations are inadmissible in criminal trials, the reasons for excluding polygraph evidence in criminal trials are not necessarily compelling in post-trial proceedings, and, therefore, subject to certain guidelines, the decision to consider polygraph evidence in post-trial proceedings is within judicial discretion. *See State v. Catanese*, 368 So. 2d 975, 982–83 (La. 1979); *see also State v. Rault*, 445 So. 2d 1203, 1218 (La. 1984).

In the fourth and fifth paragraphs of its Reasons for Judgment, the district court addressed post-trial evidence, finding that none of the exhibits submitted by the relator qualified as "newly discovered evidence" under La. Code Crim. Proc. art. 930.8. Specifically, the district court dismissed the affidavits of Ms. Dale Pierre (which included the fact that her son, Mr. Pierre, had recanted his allegation

_____

for objection by the State or a finding by the district court that the relator could not meet the threshold burden in his application for DNA testing was at the time his application for new testing was filed and considered. In this case, however, the State did not object to, and the trial court granted, the defendant's application for new DNA testing.

that relator was involved) and Mr. Pierre (recanting his statement to police that the relator was involved in the crime), stating that each affidavit "was addressed at trial" and was "inconsistent with the testimony at trial" and, therefore, did not qualify as "newly discovered evidence" under the exception to the time limitation on Article 930.8. As the relator correctly points out, the issue of his co-defendant's recantation of the portion of his statement inculpating the relator in the crime was made subsequent to his conviction and *not* addressed at trial. Further, the district court's statement that this evidence was "not consistent with the testimony at trial" supports the relator's assertion that the evidence was previously unknown.

Moreover, in *State v. Hurst*, 2015-455 (La. 9/18/15), 209 So. 3d 701, the Louisiana Supreme Court held that where an eyewitness later recanted inculpatory statements that were introduced at a defendant's trial and alleged police and prosecutorial misconduct, and "stated that he had not previously revealed the information to any investigator or attorney representing relator," the defendant sufficiently demonstrated that the facts upon which the claim was predicated were not known to defendant or his prior attorneys and "therefore the exception to the post-conviction limitations period" was applicable. Similarly, in this case, the relator and his attorneys heard for the first time that Mr. Pierre's false statements introduced at trial were the result of police misconduct and that he subsequently recanted his inculpatory statements regarding the relator's involvement in the crime. Notably, the affidavit executed by Ms. Dale Pierre (Mr. Pierre's mother) corroborates Mr. Pierre's recantation and, in addition, indicates the prosecutor's knowledge of said recantation and, arguably, that the prosecutor purposely withheld or disregarded that evidence in an attempt to persuade (or ask Ms. Pierre to persuade) the relator to accept the "package" plea deal. Under these

27

circumstances, the relator sufficiently demonstrated that his co-defendant's recantation[22] of his statements to police, as well as Ms. Pierre's corroborating affidavit, were unknown to him and his attorneys. Therefore, these statements constitute newly discovered evidence (or facts not known to petitioner or his attorneys) that would fall under the exception to the time limitation in Article 930.8(A)(1). The district court erred in finding the claims based upon this evidence to be procedurally barred from consideration.

In the sixth and eighth paragraphs of its Reasons for Judgment, the district court refers to claims based on "a witness who saw Mr. Ballard injured after his interrogation" and "witnesses to his where-abouts on the night of the crime," finding them to be without merit and procedurally barred. The witness who saw him injured apparently refers to the affidavit of Tyrus Duplesses who asserted that he saw the relator after his arrest and observed the relator's swollen and injured groin area (and stated that the relator told him that he was beaten and forced to sign a false statement). The witness to his whereabouts on the night of the crime apparently refers to the affidavit of Sabrika Lewis who claims that she saw the relator at a high school party several hours before the crime.

As the State correctly observes, the relator would have had knowledge of anyone he saw or spoke on the night of the crime or prior to or directly following his arrest, and thus the evidence would not have been unknown to him. Accordingly, the district court did not err in finding claims based upon the affidavits of Mr. Duplesses and Ms. Lewis to be procedurally barred. We do note, however, that in its opposition to the relator's application, the State characterizes

---

[22] It is axiomatic, of course, that "courts must view recantations with utmost suspicion." *State v. Chester,* 2015-2304, p. 14 (La. 12/16/16), 208 So.3d 338, 348 (citations and internal quotation marks omitted).

the statement of Farrel Anderson (the person who loaned his vehicle to Sidney Williams) as an attempted alibi witness along with Sabrika Lewis. Thus, although the district court is not incorrect as to the affidavits of Mr. Duplesses and Ms. Lewis, it must be reiterated that Mr. Anderson's statement (which is included in the supplemental police report that underlies the relator's *Brady* claim) is not procedurally barred from consideration.

In the seventh paragraph of its Reasons for Judgment, the district court refers to the relator's claim that Mr. Egan (the attorney initially appointed to represent him) employed a legal secretary who simultaneously worked as the legal secretary of the District Attorney's office. In his Reply to the State's Opposition, the relator expressly withdrew this claim. Accordingly, the district court's ruling on this issue is moot.

In the ninth paragraph of its Reasons for Judgment, the district court held that the relator's claim regarding the jurors' misunderstanding of whether they could issue separate verdicts for the relator and his co-defendant[23] to be without merit. Notably, the State did not assert a procedural objection to this claim, although it styled its answer as such. Rather, the State cited the *voir dire* transcript to argue that each party adequately instructed the jurors during *voir dire* that they had a duty to issue separate verdicts. The State also asserted that the jurors' credibility is suspect due to the passage of time. The district court apparently agreed with the State, finding that, "the jury was properly informed of their [sic]

---

[23] The relator attaches the affidavits from several jurors and an alternate juror in which they assert (1) that they would have reconsidered their guilty verdict had they been presented with the evidence contained in the supplemental police report; and (2) that they were under the mistaken presumption that they were required to render the same verdict for both co-defendant's rather than separate verdicts for each. The relator claims that the trial court failed to issue jury instructions sufficient to inform the jury that it was required to issue separate jury verdicts for each co-defendant.

ability to issue separate verdicts for the Defendants," and ruled that the jurors' statements were not newly discovered evidence. While it is not at all clear that counsel's statements to prospective jurors during *voir dire* carries the same authority of the court's jury charge, it is undisputed that a district court may not inquire into the jury's deliberative process to determine how they came to issue their verdicts, nor may affidavits be introduced for that purpose, except to determine whether extraneous influence corrupted the proceeding. Specifically, La. Code Evid. art. 606(B) provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

In any event, any claim based on misleading or unclear jury instructions themselves has long since prescribed. *See* La. Code. Crim Proc. art. 930.8; La. Code Crim. Proc. art. 930.4(E); La. Code Crim. Proc. art. 841; *see also State v. Blank*, 2016-0213, p. 4 (La. 5/13/16), 192 So.3d 93, 97.

In the tenth paragraph of its Reasons for Judgment, the district court correctly ordered an evidentiary hearing to determine the merits of the relator's claim that an alternate juror participated in deliberations.

In the eleventh paragraph of its Reasons for Judgment, the district court characterizes the relator's *Brady* claim as an argument that the District Attorney's open file discovery policy was a newly discovered fact that would qualify as an

30

exception to the time limitation.  The district court misapprehends the relator's

claim.  Rather, the relator argues quite correctly that open file discovery did not

discharge the State's affirmative *Brady* obligation.

In the final two paragraphs of its Reasons for Judgment, the district court

alludes to the relator's prior allegations of ineffective assistance of counsel in his

direct appeal and second application for post-conviction relief.[24]  Notably, the

State's only basis for its procedural objection under this article was that defendant

"has raised an ineffective assistance of counsel claim in both his direct appeal of

the conviction and second application for post-conviction relief," and "inexcusably

omitted the allegations regarding the supplemental report."   The district court

agreed with the State, dismissing this claim as procedurally barred because "[t]he

record is clear that the relator had alleged a claim for ineffective assistance of

counsel twice previously." It also found that because the evidence on which these

---

[24] In the State's opposition, it asserted the procedural objection that the relator's ineffective
assistance of counsel claims should be dismissed as successive and repetitive under Article
930.4.  La. Code Crim. Proc. art. 930.4 provides:
    A. Unless required in the interest of justice, any claim for relief which was
    fully litigated in an appeal from the proceedings leading to the judgment
    of conviction and sentence shall not be considered.
    B. If the application alleges a claim of which the petitioner had knowledge
    and inexcusably failed to raise in the proceedings leading to conviction,
    the court shall deny relief.
    C. If the application alleges a claim which the petitioner raised in the trial
    court and inexcusably failed to pursue on appeal, the court shall deny
    relief.
    D. A successive application shall be dismissed if it fails to raise a new or
    different claim.
    E. A successive application shall be dismissed if it raises a new or
    different claim that was inexcusably omitted from a prior application.
    F. If the court considers dismissing an application for failure of the
    petitioner to raise the claim in the proceedings leading to conviction,
    failure to urge the claim on appeal, or failure to include the claim in a prior
    application, the court shall order the petitioner to state reasons for his
    failure. If the court finds that the failure was excusable, it shall consider
    the merits of the claim.

claims were based was "available" to defendant and/or his prior counsel, "this allegation, though new, was inexcusably omitted from his previous applications."

We must observe that the district court finding that the relator's ineffective assistance of counsel claims in the instant post-conviction relief application are successive and repetitive, while also acknowledging that they are "new," is inexplicable. Moreover, the issue is not whether a generic claim of ineffective assistance (based on other facts) has been previously raised; rather, the district court must look at the specific claim and the specific evidence submitted in support of that claim to determine if the evidence is "newly discovered" within the parameters of Article 930.8(A)(1). First, the relator did not raise an ineffective assistance of counsel claim on direct appeal, as the State suggested in its opposition. *See generally State v. Pierre*, 99-3156, p. 14 (La. App. 4 Cir. 7/25/01); 792 So.2d 899, 907. Rather, the record in this case indicates that the relator raised one previous ineffective assistance of counsel claim in his second *pro se* application for post-conviction relief, alleging that his appellate counsel was ineffective for failing to raise on appeal the erroneous denial of his motion to suppress the photographic line-up. Clearly, because the claim of ineffective assistance of counsel in the instant application is predicated on a new substantive claim, it was error for the district court to dismiss it as impermissibly repetitive. *See State ex rel. Cormier v. State*, 98-2111 (La. 12/18/98); 731 So. 2d 274, *enforcement denied as moot*, 98-2111 (La. 6/18/99); 745 So. 2d 614. ("We also note that the discovery of new evidence excepting a claim from the prescriptive period of La. Code Crim. Proc. art. 930.8 would necessarily except a claim from the repetitiveness bars of La. Code Crim. Proc. art. 930.4 and the district court thus abused its discretion in defaulting another of relator's claims as repetitive.").

32

Because any discussion of the relator's other claims is premature until the district court makes a determination on the merits of the relator's *Brady* claim, we pretermit further discussion of those claims.

*Conclusion*

The district court judgment is affirmed in part, reversed in part, vacated in part, and remanded to the district court for an evidentiary hearing on the relator's claims for post-conviction relief. As discussed above, the district court did not err in finding that the affidavits of Sabrika Lewis and Tyrus Duplesses are procedurally barred from consideration; nor was it error for the district court to reject the relator's claim with regard to the jury's understandings of the law or to order an evidentiary hearing on the relator's claim that an alternate juror participated in jury deliberations. However, with respect to its remaining conclusions, we reverse the district court judgment to the extent that it dismisses the relator's claims as procedurally barred and vacate the district court judgment to the extent that it dismisses the relator's claims on the merits.

On remand, the district court shall first consider the relator's *Brady* claims in light of the applicable law. Pursuant to *Brady,* in accordance with the Due Process clause of the Fourteenth Amendment, the State must disclose to the defense evidence that is favorable to the defense and is material to guilt or punishment. In other words, suppression by the State of evidence favorable to the accused (after receiving a request for it) is a constitutional due process violation where the evidence is material either to guilt or punishment, regardless of the good or bad intent of the prosecution. *Brady,* 373 U.S. at 87. Favorable evidence includes that which impeaches the testimony of a witness when the reliability or credibility of that witness may determine guilt or innocence. *United*

33

*States v. Bagley*, 473 U.S. 667, 676, (1985); *Giglio v. United States*, 405 U.S. 150, 154 (1972). The duty to disclose evidence favorable to an accused is applicable even when there has been no request by the accused, *U.S. v. Agurs,* 427 U.S. 97 (1976), and encompasses impeachment evidence as well as exculpatory evidence.[25] *Bagley*, 473 U.S. 676. Therefore, the *Brady* rule includes evidence known only to police investigators and an "individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). In other words, prosecutors are "not just team members winning at all costs on behalf of the government" but, rather, they "play[] a special role" in the "search for truth in criminal trials." *Strickler,* 514 U.S. at 281. As such, a prosecutor's duty to disclose does not end with a jury's verdict but, instead, the prosecutor remains bound by the ethics of his office even after a conviction "to inform the appropriate authority of after acquired or other information[26] that casts doubt upon the correctness of the conviction." *State v. Pierre,* 2013-0873, p. 11 (La. 10/15/2013), 125 So.3d 403, 410 (citation omitted).

If the district court determines that the relator fails to establish that the State committed a *Brady* violation by withholding material, it must then consider whether counsel knew or should have known of the exculpatory material and whether counsel's failure to use it constitutes ineffective assistance of counsel, as well as the relator's remaining actual innocence and interest of justice claims. *See*

---

[25] "Such evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Greene,* 527 U.S. 263, 280 (1999) (citations and internal quotation marks omitted).
[26] The standard of review on a claimed *Brady* violation is not whether the verdict would more likely than not have been different had the evidence been admitted, but whether in its absence defendant received a fair trial, resulting in a verdict worthy of confidence. *Kyles v. Whitley*, 514 U.S. at 434.

La. Code Crim. Proc. art. 930.8(A)(1); *see also State v. Paul*, 2015-2278 (La. 11/2/16) 202 So.3d 995 (granting writs and remanding the case to the district court: "The district court's ruling dismissing relator's actual innocence claim is reversed and the claim is remanded for consideration after an evidentiary hearing.").

**WRIT AFFIRMED IN PART,
REVERSED IN PART, VACATED
IN PART AND REMANDED.**